**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

:

IN THE MATTER OF THE           :        CRIM. NO. 5:08-MJ-00109
EXTRADITION OF
MARY BETH HARSHBARGER   :        (MANNION, M.J.)

:

**MEMORANDUM AND ORDER**

Pending before the Court is a complaint, Doc. No. 1, brought by the United States on behalf of the government of Canada. The Complaint seeks the extradition of Mary Beth Harshbarger from the United States to Canada. However, at this juncture, the complaint specifically seeks interim relief, viz., "a warrant ... pursuant to Title 18, United States Code, Section 3184, for the arrest of Mary Beth Harshbarger; that she [may] be brought before this Court and that evidence of [alleged] criminality [be] heard" in order to determine her extraditability. Doc. No. 1 at 2 (quoting prayer for relief). Having examined the government's *ex parte* complaint and submission, the United States-Canada extradition treaty and subsequent protocols, and statutory authority, the Court has determined that a warrant for arrest is not necessary, and, in lieu thereof, the Court will order a summons to be issued and served by the United States Marshall.

**I.      PROCEDURAL AND FACTUAL HISTORY**

The United States (hereinafter "the Government") has filed an *ex parte*

complaint (hereinafter the "Complaint") seeking, on behalf of the government of Canada, the extradition of Mary Beth Harshbarger to Canada for alleged crimes committed in the Canadian province of Newfoundland and Labrador on or about September 14, 2006. (Doc. No. 1.)

In addition to the Complaint, the Government also filed: (1) a request for extradition, Doc. No. 2; (2) the Declaration of Susan Torres, an Attorney-Adviser in the Office of the Legal Adviser, United States Department of State (hereinafter the "State Department"), with the diplomatic note of the Canadian Government to the State Department requesting extradition, and copies of the treaties and protocols governing United States-Canadian extradition, Doc. No. 3; (3) the affidavits of Stephen R. Dawson, the Senior Crown Attorney (Acting) at the Special Prosecutions Office in the provincial Department of Justice, a criminal information (hereinafter the "Information") supported by an affidavit sworn by Constable Doug Hewitt before Canadian Justice of the Peace Donna Antle, a Warrant of Arrest signed by Canadian Justice of the Peace Pamela Arnold, the affidavit of Constable Douglas Hewitt (hereinafter "Hewitt aff."), the affidavit of Lambert Greene, and a picture of the accused,[1] Doc. No. 4 & Exh. A; and (4) a proposed order sealing the Government's eighty-six page 5-part filing, Doc. No. 5. The Court signed the proposed order. *Id*.

---

[1] The various documents comprising Document Number 4 on the Court's electronic docket came with associated documents, certificates, and/or notarial stamps supporting the underlying documents' authenticity. (Doc. No. 4.)

2

The gravamen of the Complaint and the related filings is that on or about September 14, 2006, during a hunting trip in Newfoundland,[2] defendant Mary Beth Harshbarger, an American citizen, in a criminally negligent manner caused the death of her husband, Mark Harshbarger, when she mistook him for a bear[3] while he was coming out of the woods, and shortly after sunset,[4] shot and killed him. The Canadian authorities have since charged her with violating Sections 219(1) and 220(a)[5] of the Criminal Code of Canada (relating to criminal negligence[6] causing death of another – where a firearm is used in

---

[2] *See* Hewitt Aff. ¶7 (noting that the defendant and her family were hunting for "moose and black bear").

[3] *See, e.g.*, Hewitt Aff. ¶8. The records also reveal that Mark Harshbarger was not wearing the customary orange hunting gear, rather, he was wearing a "navy blue sweat shirt and dark bibbed blue jeans." *Id.* ¶ 10; see *also id*. ¶13 (noting that Mark Harshbarger "was not wearing orange clothing").

[4] *See* Hewitt Aff. ¶¶ 19, 20 (noting that sunset was at "19:31 hrs" at that location on the day of the incident, and estimating that the incident occurred at "1955 hrs").

[5] The Information recites a violation of Section 220(a), but the Complaint refers to Section 220 generically. The Court assumes that its decision here is governed by the charge in the Information, not in the Complaint.
  Likewise the Complaint alleges a violation of Section 219(1), but the Information does not. However, this latter difference is not troubling because Section 220 incorporates by reference Section 219.

[6] R.S.C. 1985, c. C-46, s. 219. Criminal "negligence" causing death under Canadian law apparently does not extend to mere tortious negligence. Rather it extends to acts or omissions which "show[] wanton or reckless disregard for the lives or safety of other persons." *Id*.

the commission of the offense), and Section 86(1) of the Criminal Code of Canada[7] (relating to the commission of an offense in conjunction with the careless use of a firearm). Each offense, under Canadian statutory law, carries a penalty or potential penalty in excess of one year imprisonment.[8] Although an element of Section 220 is criminal negligence – *i.e.*, "show[ing] wanton or reckless disregard for the lives or safety of other persons" – the affidavits offered in support of extradition make no factual claims to support finding any such heightened *mens rea*. At most, a fair reading of the affidavits suggests mere tortious negligence, if even that. One might even fairly construe the affidavits to suggest that all that happened was a horrific constellation of unfortunate facts, not even amounting to tortious negligence. In this respect, the Government's filing and the Canadian government's affidavits in support of their request for extradition are distinctly odd.

After the tragic death of Mark Harshbarger, Mary Beth Harshbarger was interviewed. She stated that "she thought she was shooting at a black bear when she shot [her husband]," who was some "200 feet" away when shot. *See* Dawson Aff. ¶¶ 12, 15. Canadian authorities conducted an investigation into the alleged crimes. The Canadian authorities went as far as to reenact

---

[7] R.S.C. 1985, c. C-46, s. 86.

[8] *See* R.S.C. 1985, c. C-46, s. 220(a) (statutory minimum of four years); R.S.C. 1985, c. C-46, s. 86(3)(a)(I) (prescribing, for a violation of Section 86(1), a punishment not to exceed 2 years).

the events on September 16, 2006 and again on September 13, 2007. After conducting their investigation, the Royal Canadian Mounted Police investigator concluded: "it was too dark to hunt safely at 7:55 p.m. [the time Mark Harshbarger was shot]." *Id*. ¶ 14; Hewitt Aff. ¶ 21 (same); *see also id*. ¶ 16(ii) (concluding that Constable Hewitt "thought it plausible that Mary Beth Harshbarger may have felt that she was shooting at a bear. In my opinion, the lighting conditions were too dark to have fired a shot."); *id*. ¶ 16(iii) (stating that Cpl. Thibault concluded: "it is quite plausible that Mary Beth Harshbarger felt she was looking at a bear. Based on his observations and years of hunting experience, under the conditions as presented during this exercise, that he would not have taken a shot as it was just too dark"); *id*. ¶ 16(iv) (stating that Cpl. Eady concluded: "[t]hat even when looking through the scope of the rifle used in the incident, all that he could see was a dark mass").

More than six months following the *second* reenactment and more than one and a half years after the 2006 incident, Hewitt swore an information before a Canadian Justice of the Peace, and a warrant for the arrest of the defendant was issued. *Id*. ¶ 22. Thereafter, the Canadian government contacted the State Department and requested extradition. *Id*. ¶ 23. The State Department filed this action more than two years after the underlying events, and long after the defendant had apparently lawfully returned home, to the

United States.[9] The Government alleges that the defendant may currently be found in Meshoppen, Wyoming County, Pennsylvania – a location within the jurisdiction of the Court. Complaint ¶ 4.

## II. LEGAL STANDARD

Extradition between the United States and Canada is controlled by treaty and statutory authority. *See* Treaty on Extradition,[10] Dec. 3, 1971, U.S.-Canada, T.I.A.S. No. 8237 (as amended by protocols of 1988 and 2001); [18 U.S.C. §3184](). Article 2 of the 1971 Treaty was replaced by Article 1 of the First Protocol. Article 1 provides for extradition under the so-called "dual

---

[9] The Complaint describes the defendant as having "fled outside the boundaries of Canada." Complaint ¶ 4. But this statement is unsupported by *any* evidence. No factual basis is put forward even remotely suggesting that the Canadian authorities sought to restrain the defendant from returning to the United States. It is difficult at best to understand how a person's returning home, when under no legal restraint to remain abroad, can be fairly, justly, or earnestly characterized as "flight." The Court is of the opinion that the Government's filing was a standardized form, which no doubt has language applicable to the most common case – where an alien defendant has, in fact, fled to the United States from a foreign crime scene. However, such allegations seem entirely out of place here. *See* Complaint ¶ 2 (referring to "Marty," rather than "Mary" Harshbarger).

[10] The Treaty on Extradition (hereinafter, "1971 Treaty," and collectively with subsequent protocols, *infra*, the "Treaty") has been subsequently amended by two protocols. *See* Protocol Amending the Extradition Treaty with Canada (hereinafter the "First Protocol"), Jan. 11, 1988, U.S.-Canada, 1988 U.S.T. LEXIS 182; Second Protocol Amending the Extradition Treaty with Canada (hereinafter "Second Protocol"), Jan. 12, 2001, U.S.-Canada, 2001 U.S.T. LEXIS 92, 2006 WL 2530939.

criminality" standard, *i.e.*, "Extradition shall be granted for conduct which constitutes an offense punishable by the laws of both Contracting Parties by imprisonment or other form of detention for a term exceeding one year or any greater punishment." First Protocol, art. 1.[11]

The statutory framework for extradition is controlled by Section 3184, which provides:

> Whenever there is a treaty or convention for extradition between the United States and any foreign government, or in cases arising under section 3181(b), any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State, <u>may</u>, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, or provided for under section 3181(b), issue his warrant for the

---

[11] As explained in Part I, *supra*, each of the alleged violations of Canadian law is punishable (*i.e.*, potentially punishable) for a term in excess of one year. *See supra* note 8. However, the Government's voluminous 86-page 5-part filing fails to explain how the alleged conduct would amount to a violation of domestic law, what domestic law applies (federal or state, and if state, which state), and what punishment would be provided under domestic law. For the purpose of determining whether interim relief should be granted, the Court assumes Pennsylvania law is controlling. *See, e.g.*, *In the Matter of the United States of America Extradition of Alexander Winston Sylvester*, 4:05-CR-0490 (M.D. Pa. Feb. 14, 2006) (Jones, J.) (denying extradition, and applying Pennsylvania state law where the United States sought extradition of a prisoner incarcerated in Pennsylvania on behalf of the government of Canada), *reconsideration denied*, [2006 WL 860945 (M.D. Pa. Mar. 29, 2006)](#) (same). The Court will expect the Government to explain in future briefing and/or at oral argument what crimes, if any, are alleged to be analogous under domestic law to the charged violations of the Canadian criminal code.

apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate judge, to the end that the evidence of criminality may be heard and considered.... If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, or under section 3181(b), he <u>shall</u> certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he <u>shall</u> issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.

18 U.S.C. §3184 (emphasis added).

The critical step in the extradition process is the evidentiary hearing before a neutral judicial officer. The issues in such a hearing appear limited: (1) to whether defendant is the person identified in the government's verified complaint; (2) to "whether an extraditable charge is stated," and (3) to "whether there is probable cause to subject the person to trial." John G. Kester, *Some Myths of United States Extradition Law*, 76 GEO. L.J. 1441, 1172 (1988). The Court and parties are not yet at that critical stage. Indeed, as this matter remains under seal, the defendant is, ostensibly, as of yet, completely unaware that her extradition has been sought. At this stage what the Court must determine is whether or not federal law requires the issuance of an arrest warrant for the defendant, or whether she may receive notice of now pending extradition proceedings by some other means.

## III.   DISCUSSION

Under Section 3184, *after* the evidentiary hearing, if the Court determines that "the evidence [is] sufficient to sustain the charge," then the judicial officer "*shall* issue his warrant for the commitment of the person." 18 U.S.C. §3184 (emphasis added). In that situation, the statute uses the mandatory "shall." *See* 35 C.J.S. §55 (1999) (explaining that in these circumstances "[i]t is the statutory duty of the [judicial officer]" to issue a warrant). However, in regard to the pre-hearing stage, Section 3184 does not use the mandatory "shall," rather, it uses the permissive "may." A judicial officer is permitted to arrest a defendant whose extradition is sought, but the Court is not required to do so by statute. *See Lopez v. Davis*, 531 U.S. 230, 241 (2001) (Ginsburg, J.) ("Congress' use of the *permissive* 'may' in [18 U.S.C.] §3621(e)(2)(B) contrasts with the legislators' use of a *mandatory* 'shall' in the very same section.") (emphasis added); 35 C.J.S. §54 (1999) (noting that "[a] warrant for the arrest of the person charged *may* be issued by a [judicial officer]" prior to the evidentiary hearing) (emphasis added).  Any other construction would seem to render Congress' language a nullity. *Lopez*, 531 U.S. at 240 ("If [18 U.S.C.] §3621(e)(2)(B) functions not as a grant of discretion to determine early release eligibility, but both as an authorization and a command to reduce sentences, then Congress' use of the word 'may,' rather than 'shall,' has no significance.").

Although Section 3184 does not expressly authorize the use of a

9

summons, given that the greater power to arrest the defendant is provided, it seems to follow that the Court also has the lesser power to make use of a summons. *Cf. Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 345-46 (1986) ("In our view, the greater power to completely ban casino gambling necessarily includes the lesser power to ban advertising of casino gambling ...."). Indeed, if a summons (as an alternative to arrest) is not permissible, it is difficult to understand by what other mode a case such as this could proceed. Furthermore, in regard to offenses against the United States, a summons is the standard alternative to an arrest warrant. Fed. R. Crim. P. 4(a) (noting that an initial appearance may be made in consequence of an arrest or summons). Indeed, leaving aside who has discretion to determine whether a summons or warrant should issue, it is clear that a summons is the preferred means to bring a defendant before a judicial officer at the initial appearance stage. Fed. R. Crim. P. 4, 1975 Enactment History ("Rule 4 gives priority to the issuance of a summons instead of an arrest warrant.").[12]

The Court also notes that if our well respected counterparts in the Canadian justice system were faced with an identical case to this one, except that the alleged crime happened on our soil and the citizen-defendant

---

[12] The Court cites the Federal Rules of Criminal Procedure as persuasive, not controlling, legal authority. *See* Fed. R. Crim. P. 1(a)(5) (excluding extradition proceedings from the scope of the Federal Rules of Criminal Procedure).

returned home to Canada, a Canadian judicial officer would have exactly the discretion this Court has concluded it has.  A Canadian judicial officer could issue a "warrant of arrest or summons." S.C. 1999, c. 18, c. 16(3) ("The judge to whom an application is made shall issue a summons to the person, or a warrant for the arrest of the person, in accordance with subsection 507(4) of the *Criminal Code*, with any modifications that the circumstances require."); *see also* Gary Botting, 32 QUEEN'S L.J. 446, 460-61 & n.60 (2007) (same). Moreover, just as in the United States, in Canada, a summons is the preferred procedural vehicle, not a warrant. Can. Crim. Code 507(4) ("Where a justice considers that a case is made out for compelling an accused to attend before him to answer to a charge of an offence, he shall issue a summons to the accused unless the allegations ... disclose[] reasonable grounds to believe that it is necessary in the public interest to issue a warrant for the arrest of the accused.").  This Court is not controlled by Canadian legal authority.  But the existence of such discretion by our Canadian counterparts is strong indication that the Canadian authorities would have no cause for complaint if we exercise the same discretion that they would exercise in like circumstances. There is no reason to believe that an exercise of discretion by this Court would lead to any untoward friction between sovereign states or undermine the ability of the United States to meet its treaty commitments to a friendly

11

power.[13]

Having determined that the Court has lawful discretion to issue either a summons or a warrant, the Court chooses to issue a summons for the following reasons. *First*, the defendant, a United States national, has substantial connections to the United States, the Commonwealth of Pennsylvania, and the Middle District of Pennsylvania. *Second*, she is a middle-aged mother with two young children, ages six, and two and one-half. *See* Hewitt Aff. ¶ 7. She does not appear to be a flight risk. *Third*, the affidavits put forward in support of extradition do not even remotely suggest that the defendant intended to kill her late husband. Rather, a fair reading seems only to allege this was a tragedy that, in this courts opinion, would be

---

[13] In *In the Matter of Extradition of Francesco Pazienza*, 619 F. Supp. 611 (1985), Judge Brieant held that "the [United States-Italy extradition] Treaty and the implementing statute do not contemplate the situation where a requested criminal defendant, usually a fugitive from the requesting State, would be served with a summons and complaint noticing an appearance date in the future." *Id.* at 616. *Pazienza* is distinguishable from the instant case. *First*, in *Pazienza*, the defendant was an Italian national; here, by contrast, the defendant is a United States citizen. Second, in this action, there is no evidence in the record that defendant "fled" the jurisdiction now seeking extradition. Thus, it would be difficult, at best, to characterize this action as one involving a "fugitive from [a] requesting State." *Second*, and more importantly, in *Pazienza*, the Italian authorities sought the arrest of the defendant under the extradition treaty's provisional arrest provision, to be used in "cases of urgency." *Id.* The Government of Canada has sought the extradition of the defendant, but it has *not* made use of the coordinate provisional arrest provision in the Treaty. *See* 1971 Treaty, art. XI (providing for provisional arrest upon request of requesting state), *amended by* First Protocol, art. VI.

compounded if she was unnecessarily arrested on a warrant and brought into court in shackles.

In these circumstances, where it appears that there is little danger of flight risk, and where there is no record evidence indicating any danger to the community, it "would make no sense at all" to issue a warrant for defendant's arrest. Kester, *Some Myths,* 76 GEO. L.J. at 1449 (stated in the context of where bail is sought in the pre-hearing stage).

### IV. CONCLUSION

Based upon the foregoing, **IT IS HEREBY ORDERED THAT:**

1) the government's request for interim relief is **GRANTED** to the extent that the clerk of the Court shall issue a summons directed to Mary Beth Harshbarger, ordering her to attend a hearing in Court Room No. 1, the Max Rosenn United States Courthouse, Wilkes-Barre, Pennsylvania at 11:00 a.m. on Friday, January 16, 2009;

2) The United States Marshall's office shall personally serve the summons upon Mary Beth Harshbarger on or before Friday, January 9, 2009;

3) At that hearing, the Court will entertain motions for bail and a date for the evidentiary hearing called for by Section 3184;

4) Furthermore, in addition to the summons, the clerk shall supply the defendant with a copy of this case's docket, a copy of docket items 1 through 5, including any exhibits or attachments, and a copy of this Memorandum and Order;

and

5) The Court's prior sealing order (Doc. No. 5) is vacated, and, in its place, it is ordered that all documents will remain under seal until service is effectuated or the United States or the United States Marshall has notified the Court that the summons has been served, whichever comes first.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States Magistrate Judge**

**DATE: January 6, 2009**

O:\shared\ORDERS\MJ CASE ORDERS\08-mj-00109-01.wpd