UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN THE MATTER OF THE EXTRADITION | ) | 5:MJ-08-109 |
| | ) | |
| OF MARY BETH HARSHBARGER | ) | (Mannion, MJ) |

### GOVERNMENT'S PRE-HEARING BRIEF IN SUPPORT OF EXTRADITION

**1. Procedural History**

As this Court is well aware, on December 5, 2008, the United States Attorney's Office for the Middle District of Pennsylvania, at the request of Canada, filed a complaint in extradition and supporting documents. The Canadian request seeks the extradition of Mary Beth Harshbarger, who resides in Meshoppen, Pennsylvania, to Canada under the Treaty on Extradition Between the United States of America and Canada and its amending Protocols for crimes allegedly committed in a Canadian province. Those crimes, two in number, are, according to the certified supporting documents, violations of Sections 219(1) and 220(a) of the Crimes Code of Canada (relating to criminal negligence causing death of another where a firearm is used) and Section 86(1) of the same Code (relating to careless use of a firearm). Both offenses, since they carry penalties in excess of one-year imprisonment, would be considered felonies under United States federal law.

The charges arise from an incident that unfolded about a half an hour after sunset on September 14, 2006, in the northern Canadian province of Newfoundland and Labrador. Canadian authorities allege that Harshbarger, while hunting with members of her family, fired into a thicket of grass under lighting conditions too dark to discharge a firearm safely and killed her husband, Mark Harshbarger. When interviewed by Canadian authorities, Harshbarger stated

that she thought that she was shooting at a black bear.  After a lengthy investigation, in April 2008, the Canadian authorities filed a criminal complaint under Canadian law and obtained an arrest warrant.  Then, in accordance with the Treaty, the Canadian Department of Justice and the United States Department of State engaged in the diplomatic procedure under the Treaty to obtain Harshbarger's extradition to Canada.

On January 6, 2009, this Court issued a Memorandum and Order directing that Harshbarger appear before the Court on January 16, 2009, pursuant to a summons.  She did so and was released on pretrial supervision conditions.  The Court scheduled the extradition hearing for February 13, 2009.  This brief is submitted by the Government in support of Harshbarger's extradition to Canada.

**2. Legal Background and Argument**

    **A. Purpose of an Extradition Hearing**

An extradition hearing is unique, different from a criminal trial, and intertwined with foreign policy considerations of the United States.  In this case, Canada has made a treaty request for extradition.  Pursuant to Title 18, United States Code, Section 3184, a request for extradition will be certified to the Secretary of State based on the following findings by this Court:

    (1) the Judicial officer has jurisdiction to conduct an extradition proceeding;

    (2)  the Court has jurisdiction over the person;

    (3)  the person before the Court is the person named in the request for extradition;

    (4)  there is an extradition treaty in full force and effect;

    (5) the crimes for which the surrender is requested are covered by the treaty; and

(6) there is competent evidence to support the finding of probable cause as to each charge for which extradition is sought. *See Fernandez v. Phillips*, 268 U.S. 311, 312 (1925); *Eain v. Wilkes*, 641 F.2d 504, 508-09 (7th Cir. 1981); *In the Matter of the Extradition of Ortiz*, 444 F. Supp.2d 876, 881-82 (N.D. Ill. 2006)

Courts have long recognized that the statutory hearing required by § 3184 is *sui generis* in nature. *See, e.g., Hooker v. Klein*, 573 F.2d 1360, 1369 (9th Cir. 1978) (Chambers, J., concurring). An extradition hearing is not a criminal proceeding; its purpose is to decide the "sufficiency of the charge"–that is*,* probable cause -- not guilt or innocence. That inquiry is for the foreign court. *Eain*, 641 F.2d at 509-10; *In the Matter of the Extradition of Ortiz*, 444 F. Supp.2d at 883-84.

In addition, the Fourth, Fifth, and Sixth Amendments have no application to extradition hearings; thus, no indictment is required, the accused has no right to confront witnesses against him/her, no right to a speedy trial, and cannot claim a double jeopardy bar to prosecution. *See generally Neely v. Henkel*, 180 U.S. 109, 122 (1901).

Treaty requests are to be liberally constructed to effect extradition since foreign governments cannot be expected to be versed in our criminal laws and procedures. *Grin v. Shine*, 187 U.S. 181, 184-85 (1902).

**B. Applicable Evidentiary Issues**

**(1) In general**

The Federal Rules of Criminal Procedure do not apply to extradition proceedings. Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include: ... extradition and rendition of a fugitive"). Similarly, the Federal Rules of Evidence are inapplicable. Fed. R.

Evid. 1101(d)(3) ("[t]he rules (other than with respect to privileges) do not apply . . . [to p]roceedings for extradition or rendition"). *See also Eain*, 641 F.2d at 508; *Ortiz*, 444 F. Supp. 2d at 884.

**(2) Government's use of hearsay**

The Supreme Court has long held that extradition treaties do not contemplate the introduction of the testimony of live witnesses at extradition proceedings because to do so "would defeat the whole object of the treaty." *Yordi v. Nolte*, 215 U.S. 227, 231 (1909). *Accord Bingham v. Bradley*, 241 U.S. 511, 517 (1916). In *Bingham*, the Supreme Court rejected the respondent's claim that *ex parte* witness affidavits submitted in support of his extradition to Canada should not be considered because he had not had the opportunity to cross-examine those witnesses. *Id.* at 517. The Court referred to the applicable treaty language, which obligated the United States to extradite "upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial, if the crime or offense had there been committed." *Id.*

That extradition hearings rely upon written submissions and do not require live witnesses and that a certification of extradition may be and typically is based entirely on the authenticated documentary evidence and information provided by the requesting government is as firmly-rooted today as it was in 1916 when the Supreme Court decided *Bingham*.

Hearsay evidence is thus admissible at extradition hearings and may support a finding of extraditability. *Collins v. Loisel*, 259 U.S. 309, 317 (1922); *O'Brien v. Rozman*, 554 F.2d 780, 783 (6th Cir. 1977); *In re David*, 395 F. Supp. 803, 806 (E.D. Ill. 1975); *United States ex rel. Eatessami v. Marasco*, 275 F. Supp. 492, 494 (S.D.N.Y. 1967). Thus, a finding of extraditability

is typically based entirely on documentary evidence. *Shapiro v. Ferrandina*, 478 F.2d 894, 902-03 (2d Cir. 1973); *O'Brien v. Rozman*, 554 F.2d 780, 783 (6th Cir. 1977); *In re Edmonson*, 352 F. Supp. 22, 24 (D. Minn. 1972).

The Government intends to present no "live" testimony at the extradition hearing and will rely on the documentary evidence which includes statements, affidavits, certifications, and a photograph of Harshbarger.

**(3) Certification of documents**

In *Cucuzzella v. Keliikoa*, the court held that 18 U.S.C. § 3190 governs the admissibility of statements submitted by the requesting state and the standard is satisfied by a certification that accords with the terms of the statute. 638 F.2d 105 (9th Cir. 1991); *see also Collins*, *supra.* Alternatively, documents may be received in evidence if they are certified in accordance with the terms of the treaty. *Emami v. United States District Court*, 834 F.2d 1444 (9th Cir. 1987).

The requesting state must present "evidence sufficient to sustain the charge." 18 U.S.C. § 3184. Since 1848, Congress has allowed properly certified "depositions, warrants or other papers" to be received in evidence in extradition cases. Act of August 12, 1848, c. 167, §2, 9 Stat. 302, *codified as* 18 U.S.C. § 3190 (with minor changes: 18 U.S.C. § 3190 now mandates the receipt in evidence of depositions, warrants and other papers if they are certified by the "principal diplomatic or consular officer of the United States resident in such foreign country" as being "legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped"). Documents certified in accordance with Title 18 U.S.C. § 3190 are conclusively admissible. *Cucuzzella*, 638 F.2d at 106-07 (9th Cir. 1981); *Emami*, 834 F.2d at 1451; *United States v. Fernandez-Morris*, 99

F. Supp. 2d 1358, 1361 (S.D. Fl. 1999). Because the diplomatic or consular officer's certificate is conclusive on the propriety and legality of the underlying authentications, *Messina v. United States*, 728 F.2d 77, 80 (2d Cir. 1984) (quoting *Galanis v. Pallanck*, 568 F.2d 234, 240 (2d Cir. 1977)), issues concerning authentications are rare.

The documentary evidence in this case has been certified by the U.S. consular office as required by Title 18, U.S.C. § 3190, and by an officer of the Department of Justice of Canada, as required by the Treaty. Therefore, the Court must accept it into evidence at the hearing.

**(4) Evidence challenging extradition**

Due to the nature and limited purpose of an extradition hearing under Section 3184 and the importance of the international obligations of the United States under an extradition treaty, an individual's opportunity to challenge the evidence introduced against her is circumscribed. *Collins,* 259 U.S. at 316-17 (1922). It is well settled that technical defenses and affirmative defenses to the merits of the charge are *not* to be entertained in extradition hearings. *Id.; Charlton v. Kelly,* 229 U.S. 447, 462 (1913); *Haxhiaj v. Hackman*, 528 F.3d 282, 287 (4th Cir. 2008) ("The extradition hearing is not to serve as a full-blown trial and serves simply to permit a limited inquiry into the presence of probable cause to believe that there has been a violation of one or more of the criminal laws of the extraditing country.") (citations and internal punctuation omitted). A person may not introduce evidence, for example, that (1) merely conflicts with the evidence submitted on behalf of the demanding state, *Collins,* 259 U.S. at 315-317; (2) attempts to establish an alibi, *Shapiro,* 478 F.2d at 901; (3) suggests an insanity defense, *Charlton,* 229 U.S. at 462; or (4) seeks to impeach the credibility of the demanding country's witnesses, *Bovio v. United States,* 989 F.2d 255, 259 (7th Cir. 1993). These issues, which require factual and

6

credibility determinations, are for the court in the requesting country to resolve in accord with its own procedures.

In similar fashion, the person may not challenge the motives of the requesting government for bringing the charges, nor may she assert that the procedures to be utilized in the requesting country will not comport with due process, nor that she will not receive the protections of United States law.  *See Bingham, supra* (U.S. courts will presume that person will receive a fair trial in foreign country).[1]

As the cases hold, a person may not present evidence that contradicts the evidence presented by the Government, but may present only explanatory evidence**.**  *Hoxha v. Levi*, 465 F. 3d 554, 561 (3rd Cir. 2006) (quoting, *see, e.g., Barapind v. Enomoto*, 360 F.3d 1061, 1069 (9th Cir.2004) ("The general rule is that evidence that explains away or completely obliterates probable cause is admissible, while evidence that merely controverts the existence of probable cause is not.") (internal quotation marks omitted);  *Matter of Demjanjuk,* 603 F. Supp. 1463, 1464-1465 (N.D. Ohio 1984); *Fernandez-Morris,* 99 F. Supp. 2d at 1366.  Explanatory evidence is evidence rebutting probable cause, not evidence in defense. *Demjanjuk,* 603 F. Supp. at 1464. "The magistrate does not weigh conflicting evidence and make factual determinations but, rather, determines only whether there is competent evidence to support the belief that the accused has committed the charged offense." *Quinn v. Robinson,* 783 F.2d 776, 815 (9th Cir. 1986); *Austin v. Healey,* 5 F.3d 598, 605 (2nd Cir. 1993) (quoting *Quinn).*

---

[1] These issues may be brought before the Secretary of State, who has the power to refuse to extradite, despite the meeting of the extradition criteria.  *See, e.g., In re Lincoln*, 228 F. 70, 74 (E.D.N.Y. 1915), *aff'd*, 241 U.S. 651 (1916) (per curiam).

**C. Application of Law to the Facts of This Case**

**(1) The first four extradition elements are clearly satisfied.**

The first four elements necessary for extradition are fully established and are clearly satisfied. First, this Court has subject matter jurisdiction over extradition cases in that your Honor, a United States Magistrate Judge, has been assigned to hear this extradition matter, and a complaint under oath in extradition has been filed by an Assistant United States Attorney acting on behalf of the sovereign nation of Canada. *Cf.* 18 U.S.C. § 3184; 28 U.S.C. § 636; *Ward v. Rutherford*. 921 F.2d 286, 289 (D.C.Cir. 1990). Second, personal jurisdiction over Harshbarger exists because she is located in this district; she resides in Meshoppen, Wyoming County, Pennsylvania. *Ortiz*, 444 F.Supp.2d at 880. Third, Harshbarger's identity as the person wanted by the Canadian authorities through this extradition proceeding is self-evident: She appeared at the initial appearance on the extradition complaint and is obviously the individual pictured in the photograph attached as Exhibit "A" to the Affidavit of Lambert Green and described in the other Canadian extradition documents. Fourth, the extradition Treaty and its Protocols between the United States and Canada are in force as certified by Department of States' declaration filed with the complaint in extradition.

**(2) The charges are extraditable offenses under the Treaty.**

Formerly, Article 2 of the 1971 Treaty between the United States and Canada incorporated a Schedule of extraditable offenses annexed to the Treaty. This article was replaced by Article 2 of the First Protocol which sets forth the so-called dual criminality standard: "Extradition shall be granted for conduct which constitutes an offense punishable by the laws of both Contracting Parties by imprisonment or other form of detention for a term exceeding one

year or any greater punishment." As this Court already understands, both Canadian offenses for which extradition was requested are punishable by terms of imprisonment in excess of one year. (Mem. and Order at 7 n.11.) This modern treaty standard of duality only requires that the charged acts constitute an offense punishable by at least one-year imprisonment in both the United States and Canada, regardless of whether the acts give rise to similar offenses in both countries. While not every element must be the same between the countries, there must be criminality in both countries. *See Collins*, 259 U.S. at 312 ("[T]he law does not require that the name by which the crime is described in the two countries shall be the same nor that the scope of liability be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions."); *Kelly v. Griffin*, 241 U.S. 6, 15 (1916); *United States v. Sensi*, 979 F.2d 888, 893-94 (D.C. Cir. 1989). A prosecutor may use, by analogy, federal law, Pennsylvania law, or the law of a majority of the states. *Theron v. U.S. Marshall*, 832 F.2d 492, 496 (9th Cir. 1987), *overruled on other grounds by United States v. Wells*, 519 U.S. 482 (1997); *see also Hu Yau-Leung v. Soscia*, 649 F.2d 914, 918 (2d Cir. 1981) (either a violation of federal or state law suffices); *In the Matter of the Extradition of Sylvester*, 4:05-CR-490 (M.D. Pa. Feb. 14, 2006) ) (applying Pennsylvania state law to Canadian extradition request).

The Canadian crime of "Criminal Negligence Causing Death" is defined as follows:

"Every one is criminally negligent who (a) in doing anything, or (b) in omitting to do anything that it is his duty to do, shows wanton or reckless disregard for the lives or safety of others." Section 219 of the Criminal Code of Canada. Section 220 sets forth the penalty for this offense "where a firearm is used in the commission of the offense" as a minimum term of four

9

years.

United States federal law proscribes "involuntary manslaughter" under the manslaughter statute, Title 18 U.S.C. § 1112: "Manslaughter is the unlawful killing of a human being without malice. Involuntary – In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death . . . shall be . . . imprisoned not more than 8 years[.]"

Pennsylvania state law criminalizes a similar "involuntary manslaughter" offense under 18 Pa. C.S. § 2504(a):

"A person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another." The offense is punishable as a misdemeanor of the first degree under Pennsylvania law, with a maximum term of imprisonment of five years. 18 Pa. C.S. § 1104(1).

One can easily discern that all three statutes criminalize something more than tortious, ordinary, or mere negligence. Indeed, Canadian law punishes "wanton or reckless disregard" conduct, a seemingly higher standard of proof than the federal *mens rea* of "without due caution and circumspection"or Pennsylvania's *mens rea* of "gross negligence." Therefore, the Section 219 Canadian offense is extraditable under the dual criminality principle in that it is a cognate offense to either federal or Pennsylvania law.

The second Canadian offense "Careless Use of a Firearm," is defined as follows:

"Every person commits an offence who, without lawful excuse, uses, carries, handles ... a firearm ... or any ammunition ... in a careless manner or without reasonable precautions for the

safety of other persons." Section 86(1) of the Criminal Code of Canada.[2]

Pennsylvania's offense entitled "recklessly endangering another person," 18 Pa. C.S. § 2705 is defined as follows:

"A person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury." A misdemeanor of the second degree under Pennsylvania law has a maximum term of imprisonment of two years. 18 Pa. C.S. § 1104(2).

Recklessly endangering another person closely resembles the Canadian offense of careless use of a firearm. In fact, this Pennsylvania offense is frequently used to charge individuals who recklessly point loaded firearms at others. *See, e.g.*, *Commonwealth v. Rivera*, 597 A.2d 690 (1991) (mere act of pointing loaded gun does not presume negligence, however). Again, the elements of the two offenses do not have to be identical. Each offense criminalizes reckless behavior, which is more egregious than simple carelessness.

Another Pennsylvania statute which criminalizes similar conduct is 34 Pa.C.S. § 2522. Shooting at or causing injury to human beings which provides the following:

"(a) General rule.--It is unlawful for any person while hunting or furtaking, through carelessness or negligence, to shoot at, injure or kill any human being through the use of a firearm, bow and arrow or other deadly weapon."

When death results from a violation of this section, it is deemed a misdemeanor of the first degree, punishable by a maximum term of imprisonment of five years.

---

[2] In the interests of readability, the Government has reduced the quotation of this crime by eliminating non-germane elements dealing with shipping, transporting, and storage of weapons and prohibited and restricted weapons.

This section is quite similar to the Canadian statute in that is directed to criminalizing the careless use of a firearm. Thus, both the Canadian and Pennsylvanian statutes punish the same type of conduct involving a firearm.[3]

After examination of the statutes in questions, this Court should take little moment in deciding that the fifth factor, that the alleged crimes are covered by the Treaty, has been met in this case.

**(3) The Canadian affidavits and documents support probable cause to believe that Harshbarger committed the charged offenses.**

Section 3184 provides that the Magistrate Judge shall certify to the Department of State that a surrender warrant may issue "[i]f, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty [. ]" This language has long been recognized by courts to require only that probable cause be shown to support a judicial determination that a person may be extradited to a requesting country. *See Sidali v. INS*, 107 F.3d 191, 194-195 (3d Cir.1997); *Hoxha*, 465 F.3d at 560. As succinctly stated by the Seventh Circuit, "[e]xtradition depends on probable cause to believe that the [fugitive] committed an

---

[3] Whether Pennsylvania law permits criminal punishment including potential incarceration for ordinary negligence or carelessness in the setting of hunting violations is an open question, but a question unnecessary for this Court to resolve. Harshbarger's actions are alleged to have been with "wanton or reckless disregard," a state of mind of at least "criminal negligence." *Cf. Commonwealth v. Heck*, 535 A.2d 575, 579-80 (Pa. 1987) ("A person acts negligently with respect to a material element of an offense when he should be aware of a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that the actor's failure to perceive it, considering the nature and intent of his conduct and the circumstances known to him, involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation. The Official Comment to § 302 states that 'Negligently' as used in Subsection(b)(4) is intended to mean criminal negligence. The Legislature clearly did not intend the phrase 'negligently' to encompass the tort liability concept of negligence." )

offense covered by the extradition treaty." *DeSilva v. Dileonardi*, 125 F.3d 1110, 1112 (7th Cir. 1997)*; Bovio,* 989 F.2d at 258 (before fugitive can be certified for extradition, a court must find probable cause under federal law that he committed the offense he is charged with by the requesting state). Probable cause is evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief in the guilt of the accused. *Coleman v. Burnett*, 477 F.2d 1187, 1202 (D.C. Cir. 1973); *Ortiz*, 444 F. Supp. 2d at 884.

The quantum of proof necessary to establish "probable cause" is not the same as that which is required to gain a conviction. It is elementary hornbook criminal law that a "large difference" exists between the amount of proof required to sustain a conviction and the amount of proof necessary to support probable cause. *Brinegar v. United States*, 338 U.S. 160,172-73 (1949).. Probable cause therefore does not demand the certainty associated with convictions in formal trials. *Illinois v. Gates,* 462 U.S. 213, 246 (1983). *See also Brinegar*, 338 U.S. at 173. Moreover, "[c]ourts must look at the circumstances as a whole to determine whether probable cause exists."

In this request, as in all requests submitted by foreign governments pursuant to an extradition treaty, this Court must consider and take as true the facts submitted by the requesting country of Canada. The Court must also engage in a liberal reading of the supporting documents in a manner favoring extradition. *United States v. Manzi*, 888 F.2d 204 (1st Cir. 1989). The facts submitted by the Canadian authorities through the affidavits are sufficient in and of themselves to support the charges. While reasonable minds may differ whether Harshbarger's *mens rea* will be sufficient to prove guilt at trial in a Canadian court, one thing is for sure, there is at least probable cause to charge her. Taken in a light most favorable to the Canadian

government, the evidence sworn out against Harshbarger shows:

(1)  Harshbarger made statements to Cpl. Phil Matthews and Cst. Wayne Russell of the RCMP, that during the week they were hunting, they would often stop the truck, and Greene, their hunting guide, and her husband "would walk in the bush to hunt..." while she and the children waited for their return. (Hewitt Aff., ¶9ii.)

(2)  Harshbarger stated that on the night of the incident Greene and her husband had left the truck "...on a couple of occasions..." while she remained in the truck with the children. (Hewitt Aff., ¶9iii.)

(3)  Harshbarger admitted that it was "probably too dark and that she should not have fired the shot." (Hewitt Aff., ¶9v.)

(4)  Following the shooting, Constable Douglas Hewitt examined the scene, in the area where Mark Harshbarger's footprints were, and "did not see any footprints that resembled that of a black bear or any other type of animal." (Hewitt Aff., ¶ 12.)

(5)  Sunset on September 14, 2006, occurred at 7:31 p.m. and the shooting occurred at approximately 7:55 p.m. (Hewitt Aff. ¶¶ 19, 20.)

(6)  Following Constable Douglas Hewitt's re-enactment, he stated that in his opinion, "the lighting conditions were too dark to have fired a shot." (Hewitt Aff. ¶16ii.)

(7)  While Mary Beth Harshbarger's statement to authorities that she mistook her husband for a bear is plausible, trained members of the Royal Canadian Mounted Police have opined that she still should not have taken the shot. (Hewitt Aff. ¶ 16.)

(8)  Two re-enactments of the incident by the Mounties, one done two days after the shooting and another done at the same location under the same lighting conditions one year later,

solidified the theory that Harshbarger fired when she should not have.  (Hewitt Aff. ¶¶ 16-21.)

(9)     The autopsy finding regarding the angle of entry of the fatal shot corresponded to the findings of the re-enactments.  (Hewitt Aff. ¶ 17.)

(10)    Harshbarger shot into a thicket of grass ranging between four feet to four feet and nine inches at a distance 206 feet away from her.  (Hewitt Aff. ¶ 10.)

Every young child who has taken a Pennsylvania hunter-trapper safety course knows that one does not shoot at an unidentifiable target.  In this instance, Harshbarger, a hunter, knew that her husband was in the woods, that it had just turned sunset, and that he would return to the vehicle (as he had done on previous occasions), shortly.  It is hard to believe that anyone hunting after sunset and knowing that there is a loved one somewhere in the woods would take a shot at an object obscured by high grass over 200 feet away**.**  This is clearly the linchpin of the Canadian case; this was not a case of an accidental discharge or negligent handling of a firearm. Harshbarger ignored risks–of lighting, terrain, and the presence of humans–in deliberately taking the shot.  Her actions were criminally negligent and reckless.

Taken as a whole, in common-sense fashion, there is sufficient evidence to extradite Harshbarger to Canada under the Treaty.[4]

### 3. Conclusion

Unlike a mystery written by Agatha Christie or Ellery Queen, this matter is not a

---

[4] If the Court requires additional evidence in order to arrive at a finding of extraditability, it should permit the filing of supplemental briefing and documents by the  foreign government.  *See, e.g.*, *Greci v. Birknes*, 527 F.2d 956, 960-61 (1st Cir. 1976).  Were this Court to deny extradition, another complaint could be brought immediately before another judicial officer, for *res judicata* does not apply.  *Collins*, 62 U.S. at 426.

whodunit.  A short time after sunset in one of nature's most beautiful parts of Canada, Mary Beth Harshbarger discharged a bullet from a 30-06 hunting rifle that struck her husband in the chest and tragically killed him. The consequences of Harshbarger's decision to take that fateful pull of the trigger are irrefutable, but the question remains:  "Is Mary Beth Harshbarger criminally responsible for the death of her husband under the *mens rea* required by Canadian law?"  This issue, which requires factual and credibility determinations, is for the court in the requesting country to resolve at a trial.  It is not something for courts in this country to speculate about. *Cf. In re Extradition of Harusha,* 2008 WL 1701428 at 5 (E.D. Mich. 2008) (self-defense claims not relevant in extradition hearings); *In re Extradition of Powell,* 4 F. Supp. 2d. 945, 958-60 (S.D. Cal. 1998) (denying request to present evidence of a duress defense); *In re Extradition of Ramos Herrera,* 268 F. Supp. 2d 688, 697 (W.D. Tex 2003)(excluding testimony regarding an affirmative defense to a homicide charge).

      Therefore, after hearing, the Court should order the extradition of Mary Beth Harshbarger and that she be remanded into the U.S. Marshal's custody until surrendered to Canadian authorities.

Respectfully submitted,

MARTIN C. CARLSON
UNITED STATES ATTORNEY


        /s/ Christian A. Fisanick
By: _____
    Christian A. Fisanick
    Assistant U.S. Attorney
    Chief of the Criminal Division
    PA ID No. 40360
    (570) 348-2800
    FAX: (570) 348-1908
    Chris.Fisanick@usdoj.gov

Dated: February 2, 2009

**CERTIFICATE OF SERVICE BY ELECTRONIC FILING**

      The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion as to be competent to serve papers.

      That on February 2, 2009, she served a copy of the attached:

**GOVERNMENT'S PRE-HEARING BRIEF IN SUPPORT OF EXTRADITION**

by electronic filing on counsel for the defendant.

Paul Ackourey, Esquire

                                                    /s/ Donna M. Thomas
                                                    _____
                                                    Donna M. Thomas
                                                    Paralegal Assistant