**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

                                    :

IN THE MATTER OF THE         :      CRIM. NO. 5:08-MJ-00109
EXTRADITION OF
MARY BETH HARSHBARGER    :       (MANNION, M.J.)

                                      :

## MEMORANDUM AND ORDER

Pending before the Court is the United States' (the Government's) request for the extradition of Mary Beth Harshbarger, (Doc. No. 2), pursuant to the Treaty on Extradition, Dec. 3, 1971, U.S.-Canada, T.I.A.S. No. 8237 (as amended by protocols of 1988 and 2001)[1] and Title 18, United States Code, Section 3184. Having considered the parties' submissions, oral argument, the Treaty, statutory law, and case law, the Court finds that there is sufficient evidence to support Harshbarger's extradition to Canada to face the (single) charge of causing death by criminal negligence which has been brought against her there.

For the reasons elaborated below, and in compliance with Section 3184 and the Treaty, the Court will order her extradition and commitment to the United States Marshal until she is surrendered to the Canadian authorities.

---

[1] The Treaty on Extradition (hereinafter, "1971 Treaty," and collectively with subsequent protocols, *infra*, the "Treaty") has been subsequently amended by two protocols. *See* Protocol Amending the Extradition Treaty with Canada (hereinafter the "First Protocol"), Jan. 11, 1988, U.S.-Canada, 1988 U.S.T. LEXIS 182; Second Protocol Amending the Extradition Treaty with Canada (hereinafter "Second Protocol"), Jan. 12, 2001, U.S.-Canada, 2001 U.S.T. LEXIS 92, 2006 WL 2530939.

## I.    PROCEDURAL AND FACTUAL HISTORY

The Government filed an *ex parte* complaint (the "Complaint") seeking, on behalf of the government of Canada, the extradition of Mary Beth Harshbarger to Canada for alleged crimes committed in the Canadian province of Newfoundland and Labrador on or about September 14, 2006. (Doc. No. 1.)

In addition to the Complaint, the Government also filed: (1) a request for extradition, Doc. No. 2; (2) the Declaration of Susan Torres, an Attorney-Adviser in the Office of the Legal Adviser, United States Department of State (hereinafter the "State Department"), with the diplomatic note of the Canadian Government to the State Department requesting extradition, and copies of the treaties and protocols governing United States-Canadian extradition, Doc. No. 3; (3) the affidavits of Stephen R. Dawson ("Dawson Aff."), the Senior Crown Attorney (Acting) at the Special Prosecutions Office in the provincial Department of Justice, a criminal information (hereinafter the "Information") supported by an affidavit sworn by Constable Doug Hewitt before Canadian Justice of the Peace Donna Antle (hereinafter "Hewitt Aff. #1"), a Warrant of Arrest signed by Canadian Justice of the Peace Pamela Arnold, the affidavit of Constable Douglas Hewitt (hereinafter "Hewitt Aff. #2"), the affidavit of Lambert Greene, and a picture of the accused,[2] Doc. No. 4 & Exh. A; and

---

[2] The various documents comprising Document Number 4 on the Court's electronic docket came with associated documents, certificates,

(4) a proposed order sealing the Government's eighty-six page 5-part filing,

Doc. No. 5. The Court signed the proposed order. *Id*.

The gravamen of the Complaint and the related filings is that on or about September 14, 2006, during a hunting trip in Newfoundland,[3] defendant Mary Beth Harshbarger, an American citizen, in a criminally negligent manner caused the death of her husband, Mark Harshbarger, when she allegedly mistook him for a bear[4] while he was coming out of the woods, and shortly after sunset,[5] shot and killed him. The Canadian authorities have since charged her with violating Sections 219(1) and 220(a)[6] of the Criminal Code

---

and/or notarial stamps supporting the underlying documents' authenticity. (Doc. No. 4.)  The authenticity of these documents and their admissibility at the evidentiary hearing was not contested. *But cf*. Part III[A] (discussing defendant's hearsay objection).

[3] *See* Hewitt Aff. #2, ¶7 (noting that the defendant and her family were hunting for "moose and black bear").

[4] *See, e.g*., Hewitt Aff. #2, ¶8. The records also reveal that Mark Harshbarger was not wearing the customary orange hunting gear; rather, he was wearing a "navy blue sweat shirt and dark bibbed blue jeans." *Id.* ¶ 10; *see also id*. ¶13 (noting that Mark Harshbarger "was not wearing orange clothing").

[5] *See* Hewitt Aff. #2, ¶¶ 19, 20 (noting that sunset was at "19:31 hrs" at that location on the day of the incident, and estimating that the incident occurred at "1955 hrs").

[6] The Information recites a violation of Section 220(a), but the Complaint refers to Section 220 generically. The Court assumes that its decision here is governed by the charge in the Information, not in the Complaint. Likewise the Complaint alleges a violation of Section 219(1), but the

of Canada (relating to criminal negligence[7] causing death of another – where a firearm is used in the commission of the offense), and Section 86(1) of the Criminal Code of Canada[8] (relating to the commission of an offense in conjunction with the careless use of a firearm). Each offense, under Canadian statutory law, carries a penalty or potential penalty in excess of one year imprisonment.[9]

After the tragic death of Mark Harshbarger, Mary Beth Harshbarger was interviewed. She stated that "she thought she was shooting at a black bear when she shot [her husband]," who was some "200 feet" away when shot. *See* Dawson Aff. ¶¶ 12, 15. Canadian authorities conducted an investigation into the alleged crimes. The Canadian authorities went as far as to reenact the events on September 16, 2006, i.e., two days after the incident, and again, one year later, on September 13, 2007. After conducting their investigation, the Royal Canadian Mounted Police investigator concluded: "it

---

Information does not. However, this latter difference is not troubling because Section 220 incorporates by reference Section 219.

[7] R.S.C. 1985, c. C-46, s. 219. Criminal "negligence" causing death under Canadian law does not extend to mere tortious negligence. Rather it extends to acts or omissions which "show[] wanton or reckless disregard for the lives or safety of other persons." *Id.*

[8] R.S.C. 1985, c. C-46, s. 86.

[9] *See* R.S.C. 1985, c. C-46, s. 220(a) (statutory minimum of four years); R.S.C. 1985, c. C-46, s. 86(3)(a)(1) (prescribing, for a violation of Section 86(1), a punishment not to exceed 2 years).

4

was too dark to hunt safely at 7:55 p.m. [the time Mark Harshbarger was shot]." *Id.* ¶ 14; Hewitt Aff. #2, ¶ 21 (same); *see also id.* ¶ 16(ii) (concluding that Constable Hewitt "thought it plausible that Mary Beth Harshbarger may have felt that she was shooting at a bear. In my opinion, the lighting conditions were too dark to have fired a shot."); *id.* ¶ 16(iii) (stating that Cpl. Thibault concluded: "it is quite plausible that Mary Beth Harshbarger felt she was looking at a bear. Based on his observations and years of hunting experience, under the conditions as presented during this exercise, that he would not have taken a shot as it was just too dark"); *id.* ¶ 16(iv) (stating that Cpl. Eady concluded: "[t]hat even when looking through the scope of the rifle used in the incident, all that he could see was a dark mass"). Six months following the second reenactment and more than one and one-half years after the 2006 incident, on April 30, 2008, Hewitt swore an information before a Canadian Justice of the Peace  and a warrant for the arrest of the defendant was issued. *Id.* ¶ 22. Thereafter, the Canadian government contacted the State Department and requested extradition. *Id.* ¶ 23. The State Department filed this action more than two years after the underlying events, and long after the defendant had apparently lawfully returned home, to the United States.[10] The Government alleges that the defendant may currently be found

---

[10] The Complaint describes the defendant as having "fled outside the boundaries of Canada." Complaint ¶ 4. But this statement is unsupported by *any* evidence. No factual basis is put forward even remotely suggesting that the Canadian authorities sought to restrain the defendant from returning to the

in Meshoppen, Wyoming County, Pennsylvania – a location within the jurisdiction of the Court. Complaint ¶ 4.

Responding to the Government's *ex parte* filing, this Court issued a memorandum and order directing the United States Marshal to serve a summons on the defendant. (Doc. No. 6.[11])  The order also provided that the sealing order be lifted on the Government's filing after service of the summons. *Id*. The summons was returned on January 7, 2009. (Doc. No. 7.) It directed the defendant to attend a hearing on January 16, 2009. The defendant appeared with private counsel. At that hearing, the Court heard defendant's motion for bail, which was not contested by the Government. The Court granted bail subject to numerous restrictive conditions. (Doc. No. 8.) Furthermore, after hearing from the parties, the Court issued an order setting a briefing schedule and a date for the statutory evidentiary hearing, i.e., the extradition hearing. (Doc. No. 10.) The parties filed timely briefs.  (Defendant's

_____

United States. It is difficult, at best, to understand how a person's returning home, when under no legal restraint to remain abroad, can be fairly, justly, or earnestly characterized as "flight." The Court is of the opinion that the Government's filing was a standardized form, which no doubt has language applicable to the most common case – where an alien defendant has, in fact, fled to the United States from a foreign crime scene. However, such allegations seem entirely out of place here. *See* Complaint ¶ 2 (referring to "Marty," rather than "Mary" Harshbarger).

[11] *In the Matter of the Extradition of Mary Beth Harshbarger*, Crim. No. 5:08-109, 2009 WL 37611, 2009 U.S. Dist. LEXIS 614 (M.D. Pa. Jan. 6, 2009) (Mannion, M.J.) (Doc. No. 6).

filing (Doc. No. 12 & Doc. No. 14); the Government's filing (Doc. No. 13, refiled Doc. No. 15, re-refiled Doc. No. 16).) Thereafter, the hearing took place on February 13, 2009. The Court took the parties' briefing and representations at oral argument under advisement, and this decision follows.

## II.    LEGAL STANDARD

Extradition between the United States and Canada is controlled by treaty and statutory authority, as interpreted by case law. *See* Treaty on Extradition, Dec. 3, 1971, U.S.-Canada, T.I.A.S. No. 8237 (as amended by protocols of 1988 and 2001[12]); 18 U.S.C. §3184.  Article 2 of the 1971 Treaty was replaced by Article 1 of the First Protocol. Article 1 provides for extradition under the so-called "dual criminality" standard, i.e., "[e]xtradition shall be granted for conduct which constitutes an offense punishable by the laws of both Contracting Parties by imprisonment or other form of detention for a term exceeding one year or any greater punishment." First Protocol art. 1.[13]

---

[12] *See supra* note 1 and accompanying text.

[13] As explained in Part I, *supra*, each of the alleged violations of Canadian law is potentially punishable (under Canadian law) for a term in excess of one year. *See supra* note 9. However, the Government's voluminous 86-page 5-part *ex parte* filing failed to explain how the alleged conduct would amount to a violation of domestic law, what domestic law applies (federal or state, and if state, which state), and what punishment would be provided under domestic law. In granting the Government interim

The statutory framework for extradition is controlled by Section 3184, which provides:

> Whenever there is a treaty or convention for extradition between the United States and any foreign government, or in cases arising under section 3181(b), any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, or provided for under section 3181(b), issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate judge, to the end that the evidence of criminality may be heard and considered.... If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, or under section 3181(b), he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.

18 U.S.C. §3184.

Consistent with the Treaty and Section 3184, a federal court will order extradition, if: (1) the Court has subject matter jurisdiction over the

---

relief, in the form of a summons, this Court assumed Pennsylvania law controlled. *See, e.g.*, *In the Matter of the United States of America Extradition of Alexander Winston Sylvester*, 4:05-CR-0490 (M.D. Pa. Feb. 14, 2006) (Jones, J.) (denying extradition, and applying Pennsylvania state law where the United States sought extradition of a prisoner incarcerated in Pennsylvania on behalf of the government of Canada), *reconsideration denied*, 2006 WL 860945 (M.D. Pa. Mar. 29, 2006) (same).

proceedings (and, concomitantly, the presiding judicial officer adjudicating the proceeding is authorized to conduct the proceedings); (2) the Court has personal jurisdiction over the defendant; (3) the person before the Court is the person identified or named in the Government's extradition request; (4) an in-force and in-effect treaty exists between the requesting state and the United States; (5) the alleged crime or crimes are covered by that treaty; and (6) the competent evidence put forward by the Government supports a finding as to probable cause for the crime or crimes for which extradition is sought. *See In re Ortiz*, 444 F. Supp. 2d 876, 881-82 (N.D. Ill. 2005) (Denlow, M.J.).

The parties do not contest: (1) the Court's jurisdiction (and, concomitantly, the authority of the presiding judicial officer in these proceedings); (2) the assertion of personal jurisdiction over the defendant by the Court; (3) that the defendant is the person named or identified in the Government's extradition request, and (4) that the Treaty is in-force and in-effect.

The parties do contest, in part, whether: (5) the alleged crimes meet the dual criminality standard; and, the parties also contest (6) whether the Government has put forward sufficient evidence to establish probable cause as to each of the alleged crimes.

Under 18 U.S.C. §3184, a judicial officer is required to make a determination as to whether the evidence submitted is "sufficient to sustain the charge under provisions of the proper treaty or convention." Article 8 of

the Treaty states that "[t]he determination that extradition should or should not be granted shall be made in accordance with the law of the request**ed** State ...." Treaty art. 8 (emphasis added). Likewise, Article 10 provides that "[e]xtradition shall be granted only if the evidence be found sufficient, according to the laws of the place where the person sought shall be found, either to justify his committal for trial if the offense of which he is accused had been committed in its territory ...."  It follows that:

> [t]he standard of probable cause [to be applied] in an extradition hearing is established by federal law. The assessment to be made is therefore similar to the one in a preliminary hearing under the Federal Rule of Criminal Procedure 5.1. This Court is not required to determine whether [the defendant] is guilty, but merely whether there was competent legal evidence which would justify [her] apprehension and commitment for trial if the crime had been committed in [the United States].

*In re Ortiz*, 444 F. Supp. 2d at 883-84 (citations omitted).

With regard to substantive law, in order to determine what domestic law applies to the alleged crime, the Treaty requires the Court to apply "the laws of [the] Contracting Part[y]" and to determine if under that law "imprisonment or other form of detention for a term exceeding one year or any greater punishment" would be imposed. First Protocol art. 1. As the Second Circuit explained:

> The phrase 'under the law of the United States of America' in an extradition treaty referring to American criminal law must be taken as including both state and federal law absent evidence that it was intended to the contrary.... The most reasonable interpretation ... is that for conduct that would have violated any federal statute, federal law determines whether the conduct would

10

have been a felony, and for conduct that would have violated *only*
a state statute, state law governs the felony determination.

*Hu Yau-Leung v. Soscia*, 649 F.2d 914, 918 (2d Cir.) (emphasis added), *cert. denied*, 454 U.S. 971 (1981). *But see* Government's Pre-Hearing Brief at 9 (asserting federal or state substantive law applies without recognizing the priority of federal law) (citing *Hu Yau-Leung, supra*) (Doc. No. 16.) Likewise, the relevant statute of limitations is not the Canadian one (or, at least, not only that which arises under Canadian law), but determined under domestic law, at least where the substantive law of the domestic offense establishes that the burden is on the prosecutor to show that the statute of limitations is inapplicable. *See, e.g.*, *supra* note 13 (citing *In the Matter of Sylvester*).[14] As

---

[14] During oral argument at the evidentiary hearing, the Government argued that the Court could only consider the Canadian statute of limitations. *See* Trans. 22 *et seq.* (Doc. No. 18.) The Government based its position on the fact that the Treaty provides that "[e]xtradition shall not be granted ... [w]hen the prosecution for the offense has become barred by the lapse of time according to the laws of the request**ing** State." Trans. 23 (citing Treaty art. IV[1][ii])(emphasis added). The Government argued that *Sylvester*, a decision of the Middle District of Pennsylvania, *supra* note 13, was decided in error, and further urged that the Court should adopt the alternative reasoning in *Murphy v. United States*, 199 F.3d 599 (2d Cir. 1999) (habeas context) and in *Freedman v. United States*, 437 F. Supp. 1252 (N.D. Ga. 1977) (habeas context).

The Court rejects the approach urged by the Government. The bottom line is that the Treaty is wholly silent in regard to the applicability of the request**ed** state's statute of limitations. The fact that the treaty expressly creates an affirmative defense based upon the request**ing** state's statute of limitations does not bar application of the request**ed** state's statute of limitations, particularly where the inapplicability of the requested state's statute of limitations is affirmatively placed on the Government as a matter of

explained above, under the Treaty, Canada has bargained for the application of state law where there is no analogous federal crime. *See* Treaty art. 10[1]; *Hu Yau-Leung, supra.*

Thus, in regard to the alleged violations of Section 219 and Section 220 of the Canadian Criminal Code, where – as explained below – the coordinate crime arises under domestic federal law, federal substantive law, federal procedural law, and the federal statute of limitations applies (assuming any statute of limitations applies). By contrast, in regard to the alleged violation of Section 86 of the Canadian Criminal Code, where – as explained below – the coordinate crime arises solely under state law, state substantive law applies. Furthermore, under Pennsylvania substantive law, the inapplicability of the statute of limitations is an element of every Pennsylvania criminal offense. In regard to any such charge arising under Pennsylvania law, the government shoulders the burden of proof with regard to establishing the inapplicability of

---

governing substantive law. *See* Treaty art. 8 (specifying that "[t]he determination that extradition should or should not be granted shall be made in accordance with the law of the request**ed** State ....") (emphasis added); *id.* art. 10[1] (same); *see also supra* note 13 (citing *Sylvester*). Although the counterauthority cited by the Government is interesting, there is no indication in those opinions, which were in the somewhat different habeas context, that the inapplicability of a limitations defense was a burden placed on the government under the relevant substantive law of the requested state.

Furthermore, in the context of this particular litigation, there is even less reason to believe the Canadian statute of limitations has displaced the domestic limitations bar. Here Canadian law has not adopted *any* statute of limitations for the crimes charged. Thus, it might be argued that there is nothing to displace the domestic statute of limitations.

the limitations period (as defined by Pennsylvania law) even at a preliminary hearing. *See* 18 Pa. C.S. § 103; *Commonwealth v. Bethlehem*, 391 Pa. Super. 162, 172 (1989); *supra* note 13 (citing *Sylvester*).

## III.   DISCUSSION

The parties dispute, in part, whether the charged crimes meet the dual criminality standard, and whether the Government has put forward sufficient evidence to establish probable cause. The Court discusses each issue in turn.

### A.   Are The Government's Hearsay Affidavits Admissible To Establish Probable Cause?

In a bare-bones argument, defendant takes the position that the Government's affidavits are insufficient to establish probable cause under governing Pennsylvania law. "The Pennsylvania Supreme Court has held that under Pennsylvania [l]aw, the right to confront witnesses in all criminal prosecutions extends to an adversarial preliminary hearing. As a consequence, hearsay is insufficient to establish a prima facie case against an accused." Defendant's Brief at 10-11. (Doc. No. 12.) This may very well be a correct statement of state law, but it is displaced in the extradition context by federal law, as interpreted by the Courts. A long line of on-point federal case law not only permits the use of hearsay in the extradition context, but permits the Court to rely entirely on hearsay evidence in circumstances where the Court orders extradition. As the Third Circuit explained, in the context of

an extradition proceeding brought in Pennsylvania on a murder charge:

> In considering whether the Magistrate Judge should have allowed introduction of the testimony of the recanting witnesses, we focus on whether this evidence could have affected the probable cause analysis. The probable cause standard applicable to an extradition hearing is the same as the standard used in federal preliminary hearings. Thus, the magistrate[] [judge's] role is "to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction." A judge may rely on hearsay evidence in considering whether probable cause is satisfied. *In re A.M.*, 34 F.3d 153, 161 (3d Cir.1994).

*Hoxha v. Levi*, 465 F.3d 554, 560-61 (3d cir. 2006) (Fuentes, J.) (citations and quotation marks omitted). It follows that where the authenticity and admissibility (on grounds other than hearsay) of the Government's affidavits are not challenged, the Court may admit the affidavits and rely on them notwithstanding a hearsay challenge.[15]

Also, the Court notes that if it were not allowed to rely on affidavits, extradition could only be accomplished via a mini-trial with live witnesses. Such a time consuming, expensive, and unwieldy process would undermine the whole purpose of this (or any) extradition treaty: the speedy extradition of individuals alleged to have committed criminal conduct who can then mount a full defense in the foreign jurisdiction to the crimes charged. "Reliance on

---

[15] The Court's reasoning extends at least to all cases where the coordinate domestic crime under the dual criminality standard arises under federal law. Because the Court rejects ordering extradition in regard to the state law related charges on statute of limitations grounds, the Court need not address defendant's hearsay defense vis-a-vis the charges that arise exclusively under Pennsylvania law.

the probable cause standard reflects the *universal* disinclination of the courts to transform the limited inquiry of the extradition hearing into a trial on the merits. Consequently, certain evidentiary showings inadmissible at trial will be admitted.... Subscribed or sworn to written statements are deemed competent evidence even though the relator may not cross-examine their authors."  M. CHERIF BASSIOUNI, INTERNATIONAL EXTRADITION 871, 891 (5th ed. 2007).

### B.    Do The Alleged Crimes Meet The Dual Criminality Standard?

The Canadian authorities have charged the defendant with violating Sections 219(1) and 220(a)[16] of the Criminal Code of Canada (relating to criminal negligence[17] causing death of another – where a firearm is used in the commission of the offense), and Section 86(1) of the Criminal Code of Canada[18] (relating to the commission of an offense in conjunction with the careless use of a firearm). Each offense, under Canadian statutory law, carries a potential penalty in excess of one year imprisonment.[19] The defendant does not contest the Court's interpretation of Canadian law. However, the parties do, in some instances, contest whether these alleged Canadian crimes have domestic counterparts, applicable on these facts, which would subject the defendant to more than one year of detention.

---

[16] *See supra* note 6.

[17] *See supra* note 7.

[18] *See supra* note 8.

[19] *See supra* note 9.

15

    1.    Section 219(1) and Section 220(a)'s Coordinate Crime Under Domestic Law.

The Government asserts that the coordinate charges under domestic law to Section 219(1) and Section 220 are 18 U.S.C. § 1112(a) (involuntary manslaughter),[20] which carries a potential penalty in excess of one year,[21] and 18 Pa. C.S. § 2504(a) (involuntary manslaughter),[22] which also carries a potential penalty in excess of one year.[23] The defendant concurs as to the applicability of 18 U.S.C. § 1112. The Court agrees: Section 1112 satisfies the dual criminality standard. Because a federal statute is applicable, no state law analogue applies. *Hu Yau-Leung*, 649 F.2d at 918.

    2.    Section 86(1)'s Coordinate Crime Under Domestic Law.

Neither party puts forward any coordinate provision of federal domestic

---

[20] 18 U.S.C. § 1112(a) ("Manslaughter is the unlawful killing of a human being without malice.... Involuntary – In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death.").

[21] 18 U.S.C. § 1112(b) (establishing maximum penalty for involuntary manslaughter at 8 years imprisonment, with a possible fine).

[22] 18 Pa. C.S. § 2504(a) ("A person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person.").

[23] 18 Pa. C.S. § 2504(b) ("Involuntary manslaughter is a misdemeanor of the first degree."). Under Pennsylvania law a misdemeanor of the first degree carries a maximum penalty of up to 5 years. *See* 18 Pa. C.S. § 1104(1).

law. As to state law, the Government asserts the applicability of either 34 Pa. C.S. §2522(a) (shooting at or causing injury to human beings),[24] a misdemeanor of the first degree, an offense subject to a maximum penalty of 5 years imprisonment,[25] and 18 Pa. C.S. § 2705 (reckless endangerment),[26] a misdemeanor of the second degree, an offense subject to a maximum penalty of 2 years imprisonment.[27] The defendant agrees to the applicability of 34 Pa. C.S. § 2522.

The parties do not discuss the statute of limitations in regard to the involuntary manslaughter charge under federal law, presumably because the action would clearly be within the applicable 5 year statute of limitations. *See*

---

[24] 34 Pa. C.S. § 2522(a) ("It is unlawful for any person while hunting or furtaking, through carelessness or negligence, to shoot at, injure or kill any human being through the use of a firearm, bow and arrow or other deadly weapon."). On these alleged facts, this is a misdemeanor of the first degree. *Id*. (b)(3) ("To kill a human being is a misdemeanor of the first degree.").

[25] 18 Pa. C.S. § 106(b)(6) ("A crime is a misdemeanor of the first degree if it is so designated in this title or if a person convicted thereof may be sentenced to a term of imprisonment, the maximum of which is not more than five years."); 18 Pa. C.S. § 1104(1) (same).

[26] 18 Pa. C.S. § 2705 ("A person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury."). On these alleged facts, this is a misdemeanor of the second degree.

[27] 18 Pa. C.S. § 106(b)(7) (" A crime is a misdemeanor of the second degree if it is so designated in this title or if a person convicted thereof may be sentenced to a term of imprisonment, the maximum of which is not more than two years."); 18 Pa. C.S. § 1104(2) (same).

18 U.S.C. § 3282. However, the defendant asserts that the statute of limitations has run on the state law charge, i.e., Section 2522. Defendant asserts that under 42 Pa. C.S. § 5552(a) a two year statute of limitations applies.[28] (If Section 5552(a) applies, it would preclude the application of either of the state charges asserted by the Government.)

42 Pa. C.S. § 5552(e) defines when an action is instituted or commenced for limitations purposes. Section 5552(e) states:

> Except as otherwise provided by general rule adopted pursuant to section 5503 (relating to commencement of matters), a prosecution is commenced either when an indictment is found or an information under section 8931(b) (relating to indictment and information) is issued, or when a warrant, summons or citation is issued, if such warrant, summons or citation is executed without unreasonable delay.

In other words, the statute provides that a prosecution commences for limitations purposes by any one of four ways. These include: (i) an action taken in conformity with a general rule adopted pursuant to Section 5503; (ii) when an indictment is found; (iii) upon issuance of an information in conformity with Section 8931(b); or (iv) upon the issuance of a warrant, summons, or citation if executed without unreasonable delay. Here the Government commenced this action exclusively under the aegis of the fourth method listed above, and, in doing so, it acted beyond the limitations period.

---

[28] 42 Pa. C.S. § 5552(a) ("Except as otherwise provided in this subchapter, a prosecution for an offense must be commenced within two years after it is committed.").

The Government filed this action in this Court on December 5, 2008, more than two years after the underlying events which took place on or about September 14, 2006. This Court proceeded to issue a summons which was executed shortly thereafter. It is true that the Canadian authorities issued a warrant on April 30, 2008, a date seemingly within the limitations period, but that warrant has not been "executed" in any relevant sense.[29] Indeed, even after this Court's summons was served, the defendant was not "arrested" under the aegis of the Canadian warrant. (Indeed, had the Court ordered defendant's arrest, rather than ordered the clerk to issue a summons, defendant would have been arrested per this Court's warrant, not under the Canadian one.)

The Government cannot argue that it commenced this action under any of the three remaining alternatives. No indictment appears in the record. A Canadian information appears in the record, but that information does not comply with Section 8931(b), which only provides authority to act by information to the Pennsylvania courts of common pleas. Finally, the Government cannot argue that it complied – prior to the expiration of the limitations period – with any general rule adopted pursuant to Section 5503. The Pennsylvania Rules of Criminal Procedure provide that an action is instituted by "filing a written complaint" or by "an arrest without a warrant." Pa.

---

[29] *See, e.g.*, BLACK'S LAW DICTIONARY 609 (8th ed. 2004) (defining "executed" as "2. [t]hat has been done, given or performed").

19

R. Crim. P. 502. Again, no arrest has occurred, and the only complaint in the record was the one filed with this Court, after the limitations period had passed.

Because the burden of establishing the inapplicability of the statute of limitations falls on the Government, under governing Pennsylvania law, and because the Government's own filing in this matter establishes that this action commenced beyond the limitations period, the charge relating to Section 86(1) must fail. *See, e.g.*, *supra* note 13 (citing *In the Matter of Sylvester*).[30]

---

[30] The Government's otherwise encyclopedic brief failed to discuss the application of the statute of limitations in this action. Oddly, the Government took the time to discuss what it termed as a lack of *res judicata* force of any decision this Court might issue in regard to some future action brought by the Government against this defendant – a matter wholly immaterial to the legal issues before this Court. *See* Government's Pre-Hearing Brief at 15 n.4. (Doc. No. 16.)

In the same footnote, the Government also asserts that "[i]f the Court requires additional evidence in order to arrive at a finding of extraditability, it should permit the filing of supplemental briefing and documents by the foreign government." The Court does note that the Government's citation to *Greci v. Birknes*, 527 F.2.d 956 (1st Cir. 1976), is inapposite – that was a habeas proceeding, not an extradition proceeding. Moreover, if the Government had reason to believe its filings were inadequate, it could have supplemented its filing at any time prior to the hearing in this matter. *Cf.* Michael Zander, CASES AND MATERIALS ON THE ENGLISH LEGAL SYSTEM 710 (10th ed. 2007) ("Under the adversary system, relief [is] granted if the lack of evidence at the time of trial [is] due to misfortune, but not if it was due to lack of diligence or to a deliberate decision to do without the evidence."). It should be noted that at the evidentiary hearing the Government's position evolved. There, the Government argued that should the Court decide that hearsay affidavits alone were insufficient to establish probable cause or that such affidavits were inadmissible, the Government should be allowed to call live (ostensibly

**C.    Has The Government Put Forward Sufficient Evidence To Establish Probable Cause In Regard To 18 U.S.C. § 1112(a)?**

It appears that "[p]robable cause signifies evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." *Coleman v. Burnett*, 477 F.2d 1187, 1202 (D.C. Cir. 1973). As explained Section 1112(a) is defined as follows: "Manslaughter is the unlawful killing of a human being without malice. [Including] Involuntary [manslaughter]–[a killing] [i]n the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death." Here the only element of Section 1112 or its Canadian counterpart in dispute relates to the defendant's *mens rea* or criminal intent (or lack thereof) at the time of the alleged crime. Thus the question becomes whether the Government has put forward sufficient evidence in regard to whether the defendant displayed "criminal negligence" as defined by Canadian law, *supra* note 7, which amounts to wanton or reckless disregard for the lives or safety of others. *See* Trans. 38-39 (where the Government agreed that the "wanton and reckless disregard for life" standard applies under Section 1112, as opposed to mere tortious negligence); *see also* 2A KEVIN F. O'MALLEY ET AL., FEDERAL JURY PRACTICE AND INSTRUCTIONS § 45.12, at 266 (5th ed. 2000) (providing model instruction for Section 1112 to the

Canadian) witnesses. Trans. at 49-50.

effect that: "Defendant ____ [*knew that such conduct was a threat to the live(s)*

*of* [*another*] [*others*]] [*knew of circumstances that would reasonably cause the*

*defendant to foresee that such conduct might be a threat to the lives of*

*others*]"); *id.* at 268 (noting a Ninth Circuit instruction defining the relevant

*mens rea* in terms of "wanton or reckless disregard for human life"); *id.* at 269

(noting a Ninth Circuit instruction defining the relevant *mens rea* in terms of

"gross negligence"); Third Judicial Circuit: Model Jury Instruction 5.08 -

*Recklessly*,     http://www.ca3.uscourts.gov/modeljuryinstructions.htm     (last

visited Feb. 19, 2009) (NOT YET APPROVED):

> The offense*(s)* of *(state offense or offenses that include*
> *recklessly)* charged in the indictment require*(s)* that the
> government prove that *(name of defendant)* acted "recklessly."
> This means that the government must prove beyond a reasonable
> doubt (1) that *(name)* was aware of a substantial and unjustifiable
> risk of a fact or circumstance required for the offense or that the
> result required for the offense would be caused by *(his) (her)*
> actions; and (2) that *(name)* consciously disregarded that risk[.]

Short of a direct admission or confession[31] by an individual charged with

criminal conduct, *mens rea* or intent is proven by indirect or circumstantial

evidence. *Cf.* United States v. Cartwright*, 359 F.3d 281, 287 (3d Cir. 2004)*

(Stapleton, J.) ("[I]nferences from established facts are accepted methods of

---

[31] *Cf.* Schiavone Construction Co. v. Time, Inc*., 847 F.2d 1069, 1089 (3d Cir. 1988)* (Becker, J.) (noting that "[a] plaintiff may 'rarely be successful in proving awareness of falsehood from the mouth of the defendant himself.'") (quoting *Herbert v. Lando*, 441 U.S. 153, 170 (1979) (White, J.)). It follows that "objective circumstantial evidence can suffice to demonstrate actual malice" and can even "override defendants' protestations of good faith and honest belief ...." *Id.* at 1090.

proof when no direct evidence is available so long as there exists a logical and convincing connection between the facts established and the conclusion inferred."); *United States v. Morales-Machuca*, 546 F.3d 13, 20 (1st Cir. 2008) (permitting the government to use "circumstantial evidence" to prove the requisite criminal intent required by statute); Third Judicial Circuit: Model Jury Instruction 5.01 - *Proof of Required State of Mind*, http://www.ca3.uscourts.gov/modeljuryinstructions.htm (last visited Feb. 19, 2009) (NOT YET APPROVED):

> Often the state of mind *[intent, knowledge, willfulness, or recklessness]* with which a person acts at any given time cannot be proved directly, because one cannot read another person's mind and tell what he or she is thinking. However, *(name's)* state of mind can be proved indirectly from the surrounding circumstances. Thus, to determine *(name's)* state of mind *(what (name) intended or knew)* at a particular time, you may consider evidence about what *(name)* said, what *(name)* did and failed to do, how *(name)* acted, and all the other facts and circumstances shown by the evidence that may prove what was in *(name's)* mind at that time.

Upon close and searching review of the written affidavits, the Court is compelled to find that the Government has put forward sufficient evidence to establish probable cause. This evidence includes, but is not limited to:

1. The fact that the defendant was aware her husband was in the bush at the time she took the fatal shot;[32]

---

[32] *See* Dawson Aff. ¶ 12 (noting that the defendant remained in the hunting party's truck when her husband and the guide went "in the bush searching for moose"); Hewitt Aff. #1, ¶ 4 (same); Green Aff. ¶¶ 4-6 (same); Hewitt Aff. #2, ¶ 7 (same); *id*. ¶ 9(iii) (same).

2.  The defendant's admission to the Canadian authorities that she "should not have fired the shot";[33]

3.  Statements by Canadian investigators to the effect that they would not have taken the fatal shot under all the attendant circumstances;[34]

4.  The fact that she took the fatal shot after sunset, notwithstanding the fact that shooting at that time was not, in itself, a violation of law or negligence *per se*;[35]

---

[33] Hewitf Aff. #2, ¶ 9(v) (noting that Harshbarger stated that "it was probably too dark and that she should not have fired the shot"); *cf*. Dawson Aff. ¶ 15 (defendant "stated that she *thought* she was shooting at a black bear when she shot" her husband) (emphasis added); Hewitt Aff. #1, ¶ 4 (noting that Harshbarger "said she saw what she *believed* to be a bear") (emphasis added); Hewitt Aff. #2, ¶ 9(iv) (stating that Harshbarger "wasn't really paying attention ... as she was pre-occupied with [her] children" which were also in the truck). *But cf.* Greene Aff. ¶ 8 (noting that Harshbarger "responded that she had fired her rifle at a bear"); Hewitt Aff. #2, ¶ 8 (noting that Harshbarger stated "that she had shot at a bear"); Hewitt Aff. #2, ¶ 14 (noting that Harshbarger stated: "[S]he had looked twice [and] that she was sure it was a bear and fired.... Mary Beth Harshbarger said that she never did see her husband or his blue clothing. She told him that all she saw was the black of the bear.").

[34] *See* Hewitt Aff. #2, ¶ 16(ii) ("I [Constable Hewitt] thought it plausible that Mary Beth Harshbarger may have felt that she was shooting at a bear. In my opinion, the lighting conditions were too dark to have fired a shot."); Hewitt Aff. #2, ¶ 16(iii) (noting that Constable Thibault had the same position as Hewitt, *supra*); Hewitt Aff. #2, ¶ 21 ("Police officers involved [in the second re-enactment] were of the opinion that a shot from a firearm should not be fired in such low light conditions."); Dawson Aff. ¶ 14 (noting statements by "police officers" that in their "opinion ... it was too dark too hunt safely").

[35] *See* Dawson Aff. ¶ 13 (estimating that the shot was taken 24 minutes after sunset); Hewitt Aff. #1, ¶ 4(noting that "[l]ighting conditions at the time were low as it was near dusk"); Greene Aff. ¶ 7 (noting that the event occurred as "it was getting dark"); Hewitt Aff. #2, ¶ 9(I) (noting that it was

5.  The fact that her husband, with whom she was traveling, was not wearing orange hunting clothes;[36]

6.  The fact that any number of Canadian investigators reenacting the alleged crime saw an ambiguous black mass, from which one might fairly infer that the defendant took her shot notwithstanding that the identity of what she saw was ambiguous even as to her;[37]

7.  The fact that despite defendant's claims that she saw or thought she saw a bear, no bear tracks were found by the Canadian investigator on the scene, although human footprints were visible on the ground;[38]

    and,

8.  The fact that the defendant was – apparently – a competent, if not excellent, shot even at a distance, who had, in fact, killed a caribou during the course of the same hunting trip, from which one might reasonably infer that she knew the consequences of firing her gun could be fatal to a human being.[39]

---

"very dark" at the time of the re-enactment when looking from the truck to the cut-over, the place where Mark Harshbarger was shot to death).

[36] *See* Hewitt Aff. #2, ¶ 10 (noting that the deceased was wearing blue clothing); *id*. ¶ 13 (noting that the deceased was not wearing "blaze orange clothing").

[37] *See* Hewitt Aff. #2, ¶ 16(ii) (noting that using Harshbarger's gun and scope during the re-enactment, "I could not identify the black mass that could be seen moving up and down and zig zagging back and forth"); Hewitt Aff. #2, ¶ 16(iv) (noting that Constable Eady could only see a "dark mass moving" during the re-enactment); *cf*. Hewitt Aff. #2, ¶ 9(iv) (noting that Harshbarger described her husband, which she thought was a bear, as "a big black thing").

[38] *See* Hewitt Aff. #2, ¶ 12; *cf.* Dawson Aff. ¶ 15. The lack of bear prints on the ground may create a credibility issue for a jury.

[39] *See* Hewitt Aff. #2, ¶ 9(iii) (noting that the defendant had already killed a caribou).

Assuming that the Government must come forward with evidence as to every element of the crime charged, this Court holds that the Government has done so here with regard to the Section 1112 charge, including the element of heightened *mens rea*.[40] The Court frankly acknowledges, however, that there is, in fact, evidence in the Government's affidavits which might, fairly construed, indicate that defendant's shot was neither grossly negligent, nor reckless. However, the burden at this stage is not proof beyond a reasonable doubt, but rather merely probable cause. Such mitigating evidence does not wholly undermine the Government's showing in regard to *mens rea*, at most it lays the basis for a defense at trial. *See, e.g.*, Hew. Aff. #2, ¶ 16(I) (noting that from the vantage point of the truck (from where the shot was taken) the height of the grass near the victim was "deceiving").

For the reasons elaborated above, extradition will be ordered in regard to the Section 1112 charge (i.e., Sections 219 and 220 of the Canadian Criminal Code), but not in regard to any charged violations of Pennsylvania state law (i.e., Section 86 of the Canadian Criminal Code).[41]

---

[40] The Court acknowledges that its conclusion here appears in some tension with the preliminary view expressed by the Court in its prior opinion. However, there the Court was determining whether bail was appropriate after a written *ex parte* filing. Since that time, the record has been supplemented and clarified by further briefing and oral argument.

[41] *See generally* Treaty art. XII[1].

26

IV.   **CONCLUSION**

Based upon the foregoing, **IT IS HEREBY ORDERED THAT:**

1) the Government's request for the extradition (Doc. No. 2) and surrender of Mary Beth Harshbarger is **GRANTED** exclusively in regard to the charge under Sections 219 and 220 of the Canadian Criminal Code.

2) This ruling will be certified to the Secretary of State pursuant to 18 U.S.C. § 3184. The Court will issue a notice to surrender for the commitment of Mary Beth Harshbarger, so that she may be held by the United States Marshal until surrender is made to the Canadian authorities.

3) Mary Beth Harshbarger is ordered to surrender herself, on or before 3:00 p.m., on Friday, March 13, 2009 to the facility designated by the United States Marshal for the Middle District of Pennsylvania.

4) Mary Beth Harshbarger is ordered to contact the United States Marshal's office at least three (3) business days before her surrender date to be advised of the facility to which she must surrender.

s/  *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States Magistrate Judge**

**DATE: March 4, 2009**

O:\shared\MEMORANDA\2008 MEMORANDA\08-mj-00109-02.wpd