IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


United States of America,        :
            Plaintiff            :
                                 :
                                 :
      vs                         :    5:08-MJ-00109
                                 :
                                 :
                                 :
Mary Beth Harshbarger,           :
            Defendant            :
                                 :


          BEFORE:        U.S. Magistrate Malachy E. Mannion

          PLACE:         Wilkes-Barre, Pennsylvania

          PROCEEDINGS:   Hearing on the Request for
                         Extradition

          DATE:          Friday, February 13, 2009



APPEARANCES:

For the United States:        Christian A. Fisanick
                              U.S. Attorney's Office
                              235 N. Washington Avenue
                              Scranton, PA  18501-0309


For the Defendant:            Paul P. Ackourey, Esq.
                              Law Offices of Paul P. Ackourey
                              116 N. Washington Avenue
                              Suite 1-G
                              Scranton, PA  18503

```
 1                    (11:06 a.m., convene.)

 2         MR. FISANICK:  Good morning, your Honor.

 3         MR. ACKOUREY:  Good morning.

 4         THE COURT:  Okay.  We're here on the matter of the

 5    United States on behalf of the Government of Canada in the

 6    matter of the extradition of Mary Beth Harshbarger.  The

 7    criminal number in the case is 5:MJ-08-109.  And we're here

 8    today for a hearing on the request for extradition by the

 9    government.  Now, is the government ready to proceed?

10         MR. FISANICK:  We are, your Honor.

11         THE COURT:  And is the defense ready to proceed?

12         MR. ACKOUREY:  We are, your Honor.

13         THE COURT:  Okay.  The burden is on the government, and

14    you may proceed Mr. Fisanick.

15         MR. FISANICK:  Your Honor, at this time we have filed of

16    record the extradition documents from the sovereign nation of

17    Canada, and we would introduce those as part of the record at

18    this hearing.  As stated in the government's prehearing

19    brief, extradition hearings on behalf of a foreign government

20    envision no live testimony, because as the United States

21    Supreme Court has noted, it would be quite inconvenient to

22    call detectives from foreign lands to the United States to

23    testify in support of matters that are clearly within the

24    paper of the diplomatic relations between the United States

25    and Canada.
```

1      The case law also supports the fact that hearsay is

2 admissible in an extradition hearing because the Federal

3 Rules of Evidence, as well as the Federal Rules of Criminal

4 Procedure do not apply to this proceeding.  So this is sort

5 of a sui generis proceeding at which time the government has

6 to show six elements.  So, if the Court would indulge me to

7 make the argument now I can do it as part of the government's

8 case or save it until the closing at the end of this hearing.

9      THE COURT:  Let me do this, let's cover that issue,

10 because I am going to go through each of the six elements,

11 because I think most of the elements are not in dispute.  It

12 may be -- there's one element that's clearly in dispute.  I'm

13 not sure if there's a second element in dispute.  Let me ask

14 you, in your brief counsel, Mr. Ackourey, you argue that

15 under Pennsylvania law the government is required to show a

16 probable cause hearing by non-hearsay testimony.

17      MR. ACKOUREY:  That's correct, your Honor.

18      THE COURT:  And is that still your position?

19      MR. ACKOUREY:  That is, and for that reason I would

20 object to the government relying solely on hearsay testimony

21 at this proceeding.  And I believe that it's legally

22 insufficient to argue the tenure of the treaty which governs

23 what we do here today.  It specifically says that in deciding

24 that particular evidentiary issue, that it's the law of the

25 place where the defendant is found that is controlling.

1   Specifically, it says Extradition shall be granted only if

2   the evidence be found sufficient according to the laws in

3   place where the person sought shall be found, either to

4   justify his committal for trial of the offense of which he is

5   accused has been committed in its territory or to prove that

6   he is the identical person convicted by the courts of the

7   requesting state.

8       And it's important, Judge, I think, that when you look

9   at the language, where it says the law of the place found,

10   that contrasts with what we see in Article 2 of the second

11   protocol, where in deciding -- discussing issues concerning

12   the Dual Criminality Doctrine the language is contracting

13   parties, which I think clearly would be Canada and the United

14   States in this instant.  If there was a desire to change the

15   language of Article 10 they could have used the terms

16   contracting parties in an amendment to that protocol, but

17   they didn't, they used the law where the defendant is found.

18   And she was found in Pennsylvania.

19       As you know, the Middle District Court has ruled on this

20   issue in Sylvester, at least to the extent that applied

21   Pennsylvania law, specifically Commonwealth ex. rel. Buchanan

22   v. Verbonitz, which is a Pennsylvania Supreme Court decision,

23   in which an analysis was taken of evidence being introduced

24   at a preliminary hearing to show probable cause or a prima

25   facie case, and the court specifically said that the

1   individual's right to confront was violated under

2   Pennsylvania law through the introduction of unsupported

3   hearsay.  The evidence that the government relies on here is

4   not only hearsay, but it would be multiple levels of hearsay

5   contained within the affidavits that have been submitted.

6   And I would argue, Judge, that under Pennsylvania law -- I

7   think it's blackmail law in Pennsylvania that something more

8   than hearsay is required.

9       THE COURT:  Well, let me ask you this, is it your belief

10  then based upon the second protocol that that has somehow

11  changed the fact that when -- or because it changed the words

12  contracting, the contracting parties, meaning the United

13  States and Canada, that that somehow doesn't make federal law

14  the first step in deciding?  I mean, isn't there significant

15  circuit case law that tells us that the first place we look

16  is to decide if there is a corollary in the United States's

17  law since that is the one that is the party.  If there's not

18  a corollary in the United States law, then we would move on

19  to a subordinate jurisdiction, in this case Pennsylvania.

20      MR. ACKOUREY:  I think there's a dichotomy between what

21  is to be applied in dual criminality.  I mean, I would agree

22  with you.  I think it's clear from the second argument that

23  dual criminality says we go to federal law first.  We go to

24  the law of the contracting parties.  Consequently we're

25  talking federal law.  And only then would we go to state or

1    the plurality of states if there's no state law.  But that's

2    separate and distinct from the evidentiary question that is

3    addressed by Article 10 in the treaty itself.  The

4    evidentiary question is what evidence is going to be

5    considered competent evidence to determine whether or not

6    probable cause has been established?  And there it's clear,

7    the treaty says the law of the place where she is found.

8         THE COURT:  Let me ask you, I understand that you want

9    to make it -- so, for example, if there's a separate law in

10   Luzerne County, that would trump in your mind Pennsylvania's

11   law, which would trump the United States's law because the

12   more specific we get -- if she lives in Meshoppen, and

13   they've got a local ordinance there, is it -- I'm trying to

14   figure out how -- you seem to be going from -- we'll go from

15   the largest entity down to the most specific, but isn't it

16   exactly the opposite?  Don't we look first in all treaties,

17   since the state of Pennsylvania is not involved in this

18   treaty at all?

19        MR. ACKOUREY:  Right.

20        THE COURT:  This is a treaty between the United States

21   and Canada, and Pennsylvania is not involved in any way,

22   shape or form of the treaty that was made with Canada, don't

23   we always look to the United States laws first?  And if

24   they're not there, as you mentioned in the dual criminality

25   aspect, we then begin to go in a step process going down to,

1   for example, what the state law would be.  And if there was

2   no applicable state law we would look to the majority of

3   states in the United States, even though the defendant

4   wouldn't have any connection perhaps with all the majority of

5   the states.

6       MR. ACKOUREY:  I understand where you're coming from,

7   Judge.  I'm just saying if you take a look at the language

8   itself.  How do we explain then the use of contracting

9   parties, when it clearly means that we're talking about U.S.,

10  Canada, as opposed to the language, the law of the place

11  where the person sought shall be found?  When if in fact they

12  intended the contracting parties, isn't that what would have

13  been said in the language?

14      THE COURT:  Well, isn't it what was said, only in a

15  different way?  I mean, isn't it in fact the place where she

16  was found was in the United States?  I mean, is it not the

17  United States that she was found in?  I understand that you

18  wish to make a difference, I can understand why you would

19  wish to make a difference, but with that being said, let me

20  take it a step further.

21      If we were to follow your argument on this, then what

22  would be the basis of having such a treaty?  I mean wouldn't

23  we be then and isn't there adequate federal law that tells us

24  that we're not to hold two trials, that it's not the purpose

25  in any way, shape or form for the received state or, you

1  know, in this case the United States to hold a trial to

2  determine whether the person did it, only then to send them

3  back and decide a second time whether they did it.  In other

4  words, we're not to have a trial, and the whole purpose is

5  not to be put in a position where the requesting state in

6  international treaties is required to send over its evidence

7  and witnesses and whatever for scrutiny under a foreign

8  state's laws and have a trial.  And the whole purpose of the

9  treaties are in effect to avoid that by having the trial only

10  occur in one place.

11      MR. ACKOUREY:  Well, I don't think my interpretation or

12  the application of Pennsylvania law in any way changes the

13  burden that the government would have in establishing the --

14      THE COURT:  Well, my point I guess is that under your

15  theory in Pennsylvania law they'd have to call witnesses.

16      MR. ACKOUREY:  Correct.

17      THE COURT:  The only witnesses they could call who would

18  be non-hearsay witnesses would be the actual investigators or

19  people that were involved in the case.

20      MR. ACKOUREY:  Correct.

21      THE COURT:  Isn't that exactly what the treaty was meant

22  to avoid?  That we not have a trial or require people to come

23  from a foreign country, whether it be the United States,

24  requesting extradition of a foreign national back to our

25  soil, that we don't have to send all our witnesses,

1   investigators and lab reports and all of that material over,

2   we can do it by certification through the secretary of state.

3        MR. ACKOUREY:   Well, I think that there's abundant case

4   law that says that it's not to be a trial, I concede that.

5   But I don't think that that's the kind of burden that would

6   be placed on it.   They would have to call witnesses, they

7   would have to call witnesses to allow a cross examination, to

8   allow a defendant or the person sought to be extradited to

9   cross-examine and confront the witnesses.   I guess I am

10  saying that, yes.

11       And that I don't think though that that is requiring a

12  separate trial or separate trials in two jurisdictions of

13  contracting parties.   It's simply asking the court to

14  establish a prima facie case using live testimony.

15       THE COURT:   And are you aware of any federal cases that

16  have actually required that?   That the witnesses be called

17  from a foreign country to sit in a United States Court at the

18  probable cause determination and give live testimony?

19       MR. ACKOUREY:   Sylvester is the only case that I've seen

20  that actually has applied Pennsylvania law in this context.

21       THE COURT:   But now I'm not talking about whether it

22  applied to Pennsylvania law, because Pennsylvania law may

23  apply in some things, but are you aware of any cases where

24  the foreign government was required to physically send

25  witnesses and exhibits and testimony, aside from what they've

 1  submitted to the secretaries of state in each of the

 2  countries to physically come into the United States Courts

 3  and hold live testimony?

 4      MR. ACKOUREY:  I am not, Judge.

 5      THE COURT:  Okay.  Neither am I.  Let me ask -- I

 6  understand you're basing that on your understanding of -- of

 7  your understanding of you believe the applicability of

 8  Pennsylvania law.  But let me ask you, if you're incorrect --

 9      MR. ACKOUREY:  Uh-hum.

10      THE COURT:  -- and federal law is what applies with

11  respect to the determination of probable cause, do you agree

12  then that under federal law that there is no requirement of

13  actual live testimony in an extradition hearing because the

14  Rules of Federal Procedure exclude extradition hearings from

15  the normal determination?

16      MR. ACKOUREY:  I think there's a number of cases from

17  various circuits that have held that fact material evidence

18  is sufficient.

19      THE COURT:  All right.  Is there anything else you want

20  to argue on that?

21      MR. FISANICK:  Yeah, I'd like to make a couple other

22  points on the record.  No. 1, it's curious that we would be

23  applying in a federal proceeding Commonwealth ex. rel.

24  Verbonitz v. Buchanan, which is a plurality decision of the

25  Pennsylvania Supreme Court which is based on Pennsylvania

1    procedural law.

2        While the Rules of Federal Evidence, Federal Rules of

3    Criminal Procedure do not apply to today's proceeding, we're

4    still in federal court.  And I would find that --

5        THE COURT:  When you say they don't apply, they don't

6    apply to the extent that they are specifically excluded --

7        MR. FISANICK:  Correct.

8        THE COURT:  -- from the provisions in federal law but

9    not that they in theory don't apply in federal law?

10       MR. FISANICK:  Correct.  I think the drafters of the

11   treaty would be quite shocked and surprised to find out that

12   they had bargained for the application of this parochial

13   hearsay at preliminary hearings in Pennsylvania District

14   Magisterial Courts.  In other words, if I understand

15   counsel's argument correctly, basically it's a circular boot

16   strap argument, which is here's what the treaty says and you

17   have to apply Pennsylvania law, and oh, by the way, we'll

18   read in Pennsylvania procedural law, which will trump federal

19   procedural law and the treaty.

20       And I would put on the record that that's not what was

21   clearly intended by the treatise, because all of the case law

22   from the U.S. Supreme Court on the various circuit cases that

23   have looked at this have said that this is an informal sui

24   generis proceeding that allows hearsay because we don't drag

25   detectives from foreign countries into the United States.

1    Much as under this treaty, we in the United States wouldn't

2    want United States agents dragged into Canada to testify as

3    to basically a legal issue, which is probable cause, which

4    your Honor, the United States Magistrate Judge, determines in

5    Federal Court every day.  Is there probable cause to issue a

6    search warrant?  Is there probable cause to issue an arrest

7    warrant?  So the whole procedure of a treaty envisions a

8    paper proceeding.

9         THE COURT:  All right.  I interrupted your original

10   presentation, which may happen again.

11        MR. FISANICK:  Oh, that's all right.

12        THE COURT:  But go ahead, I'll let you continue.

13        MR. FISANICK:  Anyway, as we stated in the government's

14   prehearing brief, there are six issues at play in an

15   extradition hearing.  It is my understanding that five of

16   those issues are clearly undisputed.  The first issue is the

17   subject matter jurisdiction of this court.

18        THE COURT:   And I assume that you of course believe

19   that there is sufficient evidence for each one of the six,

20   correct?

21        MR. FISANICK:  I do, your Honor.

22        THE COURT:  Or you wouldn't be here.  As to subject

23   matter jurisdiction?

24        MR. ACKOUREY:  There's no --

25        THE COURT:  All right.  And as to personal jurisdiction

1    over the defendant --

2         MR. ACKOUREY:  No dispute, your Honor.

3         THE COURT:  All right.  And third, as to the fact that

4    Ms. Harshbarger, who is in the court today, is in fact the

5    individual who has been requested by the Government of

6    Canada.

7         MR. ACKOUREY:  There's no dispute on that issue.

8         THE COURT:  And that there is in effect, in full force

9    and effect a treaty between the United States and Canada

10   that's lawful with respect to extradition.

11        MR. ACKOUREY:  I would agree.

12        THE COURT:  Okay.  And that -- now let me get to the

13   fifth one, and I'm not sure whether that's agreed to or not

14   agreed to depending on the briefs that were filed before me.

15   But the fifth one we're talking about really the dual

16   criminality, whether the alleged crimes in Canada under the

17   dual criminality provisions are in fact crimes, although they

18   may not be called the exact same crime in the United States

19   or in Pennsylvania, but let me go back to the government on

20   that.

21        MR. FISANICK:  Your Honor, as the Court has noted, there

22   has to be a dual criminality requirement.  If you look at the

23   older version of this treaty, there was a schedule that was

24   attached to the treaty that enumerated and delineated the

25   crimes, manslaughter being one of them, for example, but

1   since the protocols amending the treaty were adopted between

2   the nations of the United States and Canada it goes to what I

3   call the more modern, broader approach to dual criminality,

4   which is as long as the crimes are felonies, in other words,

5   one year incarceration potential under federal law, and

6   they're similar --

7       THE COURT:  One year more, right.

8       MR. FISANICK:  One year more, correct, one year more,

9   your Honor.

10      THE COURT:  A year is technically --

11      MR. FISANICK:  One year more.

12      THE COURT:  -- a misdemeanor --

13      MR. FISANICK:  Right.  And as long as the crimes are

14  similar, your Honor has made mention of the fact that really

15  the cases that have looked at this have looked at a step-wise

16  procedure, which is first you look to federal law, or you can

17  look to the law of the state jurisdiction, or failing that,

18  you can look to the law of a majority of the jurisdictions in

19  this case, that would be the states of the United States.

20  So, looking at the first offense that Canada has asked

21  extradition on, criminal negligence causing death.  I don't

22  think it will take great analysis to determine that is

23  equivalent to both the federal involuntary manslaughter

24  statute and the Pennsylvania involuntary manslaughter

25  statute.

1        THE COURT:  Let me ask you this:  Let's first talk about

2   federal, because if we determine that it is in fact under the

3   Federal Law 18 U.S.C. Section -- what is it, 112(a)?

4        MR. FISANICK:  Yes.

5        THE COURT:  Okay.  If it's the same as that, I don't see

6   that we're going anyplace else and I'm not so sure that the

7   defendant is disagreeing that that would in fact be the

8   corollary under --

9        MR. ACKOUREY:  Yes.

10       MR. FISANICK:  I don't think he disagrees either, your

11  Honor.

12       THE COURT:  Is that correct, Mr. Ackourey?

13       MR. ACKOUREY:  That is correct, Judge.

14       THE COURT:  All right.  So you agree there is a

15  corollary on the felony charge which is covered by United

16  States Code charge?

17       MR. ACKOUREY:  That is correct.

18       THE COURT:  And so therefore, I mean, you're welcome if

19  you want to make some other argument, but I don't see how the

20  Pennsylvania law has any relevance as a result of that

21  agreement.

22       MR. FISANICK:  That is my alternative argument since the

23  defendant concedes that that's an extra valuable [ph]

24  offense, I'll move on to the second offense under the Crimes

25  Code of Canada, which is the careless use of a firearm.  Two

1    potential statutes are in play here, and the government has

2    cited them in the brief.  The first one, and I'll --

3        THE COURT:  Let's argue this first, because first of

4    all, you're not alleging that there is a federal corollary,

5    correct?

6        MR. FISANICK:  I am not alleging that there is a federal

7    caudate, correct.

8        THE COURT:  And you also do not believe that there is a

9    federal --

10        MR. ACKOUREY:  I have not found --

11        THE COURT:  Okay, all right.  And the reason I say that,

12    so then we would move logically to the next step, which is

13    the state which you're going to argue.

14        MR. FISANICK:  Correct.  And I will explain why the

15    government makes an alternative argument here.  The

16    government argues that this would be equivalent to

17    Pennsylvania's defense of recklessly endangering another

18    person, which is graded as a misdemeanor of the second

19    degree.  And a crime called shooting at or causing injury to

20    human beings, which is actually a game offense, which is

21    classified in Pennsylvania as a misdemeanor of the first

22    degree.

23        THE COURT:  Now, that's 34(a) Pennsylvania Code.

24        MR. FISANICK:  That's correct, Title 34 of the

25    Pennsylvania Consolidated Statute 2522.

1          THE COURT:  22(a),  okay.

2          MR. FISANICK:  You got it, your Honor.  The reason why

3    the government makes this argument is while the offenses

4    don't have to be named the same, they don't have to have the

5    same elements, they have to basically prosecute the same kind

6    of criminal conduct.  Not to make a ludicrous example, if

7    Canada had a law that said you couldn't wear the color blue,

8    Pennsylvania wouldn't have an equivalent statute, you

9    wouldn't be able to extradite somebody to Canada for

10   violation of the not allowed to wear the color blue in

11   Canada.  So you have to look at basically the elements, but

12   not conclusively determine they're the same.

13          Now, if you look at Pennsylvania law, your Honor,

14   Pennsylvania law has prosecuted people for pointing loaded

15   firearms in a reckless fashion under the recklessly

16   endangering statute.  The Title 34 offense, which is the

17   shooting at someone through carelessness or negligence

18   basically has a lesser standard of mens rea, as I see it.

19   And as you'll see in the government's footnote, it's

20   questionable under Pennsylvania law whether if this issue

21   were raised before a Pennsylvania court, a Pennsylvania court

22   wouldn't say that you have to have the same level of mens rea

23   as a Crimes Code or Title 18 offense, in other words,

24   criminal negligence or recklessness.  Because Pennsylvania

25   law is fairly clear to me, that it does not punish people by

1   incarceration through an act of ordinary negligence or mere

2   negligence.

3        THE COURT:  So when you talk criminal negligence,

4   although you're using the word negligence, what you're really

5   referring to is wanton or reckless as your definition.

6        MR. FISANICK:  Correct, exactly.  And we would point out

7   that that is what the Canadian government alleges in the

8   affidavit.  They have alleged wanton reckless disregard

9   behavior, which is equivalent.

10        THE COURT:  And so we're in agreement on that as well.

11   Although the Canadian statute, the Canadian Criminal Code 220

12   and 219 I think it is, that although they title their crime

13   criminal negligence, by definition it clearly is a higher

14   mens rea status, and that's that the negligence is not what

15   we would call tortuous negligence, but rather it's described

16   more as a wanton and -- or described actually as a wanton and

17   reckless act, correct, would you agree on that?

18        MR. ACKOUREY:  Which I would argue, Judge, is akin to

19   recklessness under the Pennsylvania statute.

20        THE COURT:  And you'd agree with that I think?

21        MR. FISANICK:  I agree, it is, even though they called

22   it one thing, if you look at the actual wording of it.  So I

23   would submit to you, your Honor, that it's very similar to

24   both of those statutes in Pennsylvania, either one can fit.

25   Perhaps on the fact that it's a hunting offense, the Title 34

1    offense, if you were trying to put the peg in the hole, fits

2    a little better, but the recklessly endangering also fits

3    too, because it encompasses reckless conduct and it's also

4    been used for pointing loaded firearms at people in

5    Pennsylvania and prosecuting and convicting them.

6         THE COURT:  Now both of those are misdemeanors under

7    Pennsylvania law, but included a degree of punishment up to

8    two years or up to five years, so you know, it's called a

9    misdemeanor.  Pennsylvania is a little bit of an obscure

10   state, in that it still calls things that are punishable by

11   more than a year as misdemeanors, even though in most other

12   states the federal government refers to that as a felony.

13        MR. ACKOUREY:  That's correct.

14        MR. FISANICK:  That's correct, your Honor.  So again,

15   whichever crime or both crimes you choose, the Canadian

16   offense of careless use of a firearm is also an extraditable

17   offense under the fifth element, and I don't think that the

18   defense actually has much of a quibble with that either.

19        THE COURT:  Now, I know that I don't believe you have a

20   quibble, at least it may just add an arresting element,  Mr.

21   Ackourey, but as to the Title 34 offense, that it's my

22   understanding that --

23        MR. ACKOUREY:  That's correct.

24        THE COURT:  -- you agree that that's the higher offense

25   punishable up to five years?

1          MR. ACKOUREY:  That's correct.

2          THE COURT:  You agree that that would be a corollary.

3    What about this argument that the two year offense, the

4    reckless, do you agree that that would be a corollary

5    offense?

6          MR. ACKOUREY:  Well, only to the extent that the

7    Canadian statute specifically requires the use of a firearm

8    in the criminal conduct.  Obviously reckless endangering does

9    not.  It can encompass a whole hosts of activities, but

10   otherwise reckless and at risk of injury or death.  I would

11   argue that the violation of the hunting laws is certainly

12   more applicable.  I'm not sure that ultimately in the great

13   scheme of things it's going to make much of a difference

14   because I think what we're looking at is ultimately the

15   analysis of the conduct and whether that reaches the reckless

16   requirement.

17         THE COURT:  But for the extent -- to the extent that we

18   kind of dot our I's and cross our T's --

19         MR. ACKOUREY:  I understand.

20         THE COURT:  -- as to what the corollaries are, we're in

21   agreement then that -- or you're in agreement then, the

22   parties, that the hunting offense, the Title 34 offense under

23   the Pennsylvania Consolidated Statutes, that that offense

24   would be a corollary offense?

25         MR. ACKOUREY:  That's correct.

1      THE COURT:  And as to the lesser offense, the reckless

2  endangerment, you believe that it is?

3      MR. ACKOUREY:  I'm saying that since the Canadian

4  offense specifically requires as an element the reckless use

5  of a firearm and careless use of a firearm, that I don't

6  believe it does, but --

7      THE COURT:  And that's because the Pennsylvania offense

8  you're referring to here doesn't in the statute include the

9  term firearm, but is there any doubt that the use of a weapon

10  of any kind including a firearm could result in a reckless

11  endangerment?

12      MR. ACKOUREY:  Of course.

13      THE COURT:  Okay.

14      MR. FISANICK:  So then we move to the disputed element,

15  which is element six.

16      THE COURT:  Not yet.  Let's first talk on that second

17  one about the statute of limitations.  You did not address

18  that in --

19      MR. FISANICK:  I did not because I did not have the

20  benefit of counsel's brief, since we simultaneously filed

21  them.  I could, with the court's permission, file a

22  supplemental brief, but in lieu of that I have --

23      THE COURT:  Now, there was never -- so you know, I

24  wanted you to both file simultaneous briefs, but that was not

25  an indication that you weren't able to file -- if you wished

1    to file other matters after you received it, that you can

2    file them.  I just wanted to make sure that we got stuff

3    in --

4         MR. FISANICK:  Okay.

5         THE COURT:  -- originally.  But that wasn't meant or

6    shouldn't have been interpreted as meaning that somebody was

7    unable to file -- on either side -- to file further

8    information response or reply.  But anyway, go ahead.

9         MR. FISANICK:  Anyway, looking at this issue, and this

10   issue from my understanding of the defense's brief would only

11   apply to the hunting offense, the careless use of a firearm,

12   because as the court is well aware, the statute of

13   limitations in Pennsylvania under Pennsylvania law would not

14   have run for the careless death of the manslaughter

15   equivalent.  So we're really only looking at the second of

16   two extraditable offenses.  And --

17        THE COURT:  And under either one of the ones that you

18   would allege, since they're both misdemeanors under 5222 or

19   whatever the Pennsylvania corollary is in Title 42, the

20   statute of limitations on a misdemeanor would be up to two

21   years, right?

22        MR. FISANICK:  That's correct.

23        THE COURT:  So their argument is that either one of

24   those are outside of the statute of limitations if we're

25   applying the Pennsylvania law and the statute of limitations,

1   and so is there something you want to say about that?

2       MR. FISANICK:  I do, your Honor.  The treaty is clear,

3   the treaty is clear that the statute of limitations that

4   applies here is the statute of limitations of the requesting

5   jurisdiction.  That would be Canada.  And Canada has no

6   statute of limitations for either of these offenses.

7       Now, I am well aware of the extradition case of

8   Sylvester in this district.  And I would point out to the

9   Court, and I have copies here, the Second Circuit Court of

10  Appeals in a case called Murphy, this is out of the Northern

11  District of New York, had exactly the same issue, which was

12  the person whose extradition was sought was claiming that the

13  five year statute of limitations in New York applied and not

14  the Canadian statute of limitations.  Now, the Second Circuit

15  has ruled that it is the treaty provision that applies.  So I

16  believe it is Article 4 of the treaty that talks about the

17  statute of limitations, so I would point that out.

18      Now there's a subsidiary argument that was made in

19  Sylvester about statute of limitations becoming an element of

20  the underlying jurisdiction offense.  And I don't think it

21  was properly addressed in that case.  In fact, I think that

22  case is incorrectly decided for a lot of reasons.  But if we

23  were to follow that rationale, which was followed in

24  Sylvester, the only case that I found, there is a case out of

25  the Northern District of Georgia where the exact same

1   argument was made.

2       And the argument, as I follow defense argument in

3   Sylvester, and here it goes something like this, you have to

4   prove the elements of the Pennsylvania offense.  There's a

5   Pennsylvania Superior Court case that says statute of

6   limitation is an element of a Pennsylvania offense.

7   Therefore, you read the statute of limitations of

8   Pennsylvania into the Pennsylvania offense, it's two years,

9   the two years has passed, thus the statute of limitations

10  bars the extradition on that offense, that's a fallacious

11  argument for a couple of reasons.

12      No. 1, the treaty is clear that it is the requesting

13  jurisdiction's statute of limitations that governs.  That

14  would be Canada.  Statute of limitations is an element of the

15  offense only if it were being tried in Pennsylvania.  That

16  would be a defense to a Pennsylvania criminal prosecution if

17  the statute of limitations were two years.  We're not dealing

18  with a Pennsylvania criminal prosecution here, we're

19  basically dealing with federalism.

20      So we can't read in a statute of limitations to wipe out

21  a treaty provision despite the fact that I believe it 's

22  Article 10 of the treaty says you use the law of the

23  jurisdiction.

24      And here's another reason that I think is more

25  common-sensical why it doesn't work.  The contracting parties

1    to the treaty, the United States and Canada contracted that

2    the receiving jurisdiction's statute of limitations would

3    govern.  Using the defense's argument here, that means if

4    Mrs. Harshbarger goes to New Jersey and we arrest her in New

5    Jersey on an extradition warrant, for example, and the

6    statute of limitation for a caudate offense for using a

7    firearm in a hunting violation is five years, that means the

8    statute of limitations gives her no relief.  Canada and the

9    United States did not bargain to have 50 or -- using the

10   federal system -- 51 different statutes of limitations to

11   apply to an extradition proceeding purely fortuitously

12   dependent upon which jurisdiction the defendant was located

13   in.

14        THE COURT:  But isn't that exactly what happened with

15   respect to the statutes?  I mean, it just turns out that

16   there's no federal corollary to the statutes we're talking

17   about, so didn't they effectively bargain for 50 or 51

18   different potential statutes on things that are not covered

19   under federal --

20        MR. FISANICK:  They bargained for equivalent statutes.

21   They didn't bargain for 50 or 51 different statutes of

22   criminality.  They bargained for conduct that would give rise

23   to criminal punishment in both countries.  That's why the

24   language was very, very, very general under the dual

25   criminality provision.  But for the statute of limitations

1    it's really clear.  If a country would have bargained for a

2    different statute of limitations they would have clearly said

3    in the treaty the statute of limitations of the place where

4    the person is located governs, and it doesn't say that.  It

5    says the statute of limitations of the receiving nation.

6        So, I think that you cannot abrogate a very clear

7    provision of the treaty by again applying Pennsylvania

8    procedural law in an idiosyncratic fashion, to read in a

9    Pennsylvania statute of limitations based on a circular

10   reason.  You say okay, we have this section of the treaty

11   which says Canada statute of limitations, which they don't

12   have one, applies.  Another section of a treaty that says you

13   apply the law of the place where the defendant is located and

14   the proof thereof, so we're going to read Pennsylvania's

15   procedure into it, including the statute of limitations, it's

16   two years, thus the extraditable offense is barred.  That's

17   clearly not envisioned by the treaty.  And in fact, I

18   couldn't find any cases that support the approach in

19   Sylvester.

20       In fact, as I said, in Murphy, which the cite to that

21   case is 199 F.3d 599, 2d Circuit 1999.  Clearly agrees with

22   my argument here today.  And the Northern District of Georgia

23   case is Freedman.  And again, I have copies for counsel and

24   the court here.  Freedman v. United States at 437 F. Sup.

25   1252 1977 say exactly that.  Because you really get an absurd

1   result if you go to this looking to Pennsylvania law for a

2   procedural defense that's not granted by the treaty.

3        MR. ACKOUREY:  Well, I think counsel is missing a

4   distinction between a procedural defense and an element of

5   the defense.

6        THE COURT:  I hate to interrupt, but let me ask you

7   first, does the treaty speak specifically to which statute of

8   limitations applies?

9        MR. ACKOUREY:  Article 4 talks about the statute of

10  limitations and how it is to be applied in the treaty.

11       THE COURT:  Talks about it.  And what does it say?

12       MR. ACKOUREY:  It talks about applying the statute of

13  limitations of the requesting state.

14       THE COURT:  And in fact, in this particular case, on

15  both of the offenses, but we're really more interested in the

16  second offense --

17       MR. ACKOUREY:  Right.

18       THE COURT:  Because the first offense no one is arguing

19  that it's outside of the statute of limitations, in either

20  application, whether it be Pennsylvania law -- I'm sorry,

21  United States law or whether it be Canadian law.  But on the

22  second one the statute -- is there any disagreement that the

23  statute of limitations in Canada on both of the offenses

24  is -- there is no statute.

25       MR. ACKOUREY:  According to the submission, it has not,

1    right.

2        THE COURT:  All right.  So we know that there is no

3    statute of limitations in Canada.  The treaty seems to

4    indicate when one reads it that the receiving country,

5    meaning the country that will accept or take back the person,

6    in this case Canada, that their statute applies, would you

7    agree with that, that that appears to be what the treaty

8    says?

9        MR. ACKOUREY:  It appears to be, yes.

10       THE COURT:  Okay.  And I say that only because as a

11   background to -- I understand you're now going to argue that

12   it doesn't exactly mean that, but go ahead.

13       MR. ACKOUREY:  Right.  I think we go back to the second

14   protocol, the argument that says we're going to be going --

15   looking at the law of the contracting parties, and if none

16   then the state's.  And so we're in Pennsylvania, so we're

17   looking at Pennsylvania law, applying Pennsylvania law to two

18   statutes that the government has argued are analogous to

19   Canadian statute.

20       And Pennsylvania law has held that the statute of

21   limitations isn't -- is essentially an element of the offense

22   itself.  It's not only an affirmative defense, but it's

23   actually an element of the offence itself to be established

24   by the government at a prima facie hearing.  Statutes clearly

25   run under Pennsylvania law.  And I think the Court is correct

1   in that in fact what the parties have bargained for is if the

2   laws of the contracting parties do not apply then there's no

3   analogous federal provision that applies to the crimes that

4   we've been discussing, the crime we were discussing, we go to

5   the state laws of the state.  So, we have -- maybe we do have

6   50 or 51 different jurisdictions, but that is what was

7   anticipated.  And since it's a material element of the

8   offense itself, since the statute is run under Pennsylvania

9   law, there's no question that the -- there is no analogous

10  Pennsylvania statute since the statute was drawn.

11      THE COURT:  Is the statute of limitations in

12  Pennsylvania an element of the crime or is it an affirmative

13  defense?  There is a difference.

14      MR. ACKOUREY:  Well -- there is a difference.  In a

15  prima facie hearing in Pennsylvania the Commonwealth -- in a

16  state case the Commonwealth would bear the burden of

17  establishing that the statute does not run.

18      THE COURT:  But that still doesn't answer my question.

19  My question is not what their procedure would require in a

20  preliminary examination, but is the statute of limitations

21  under Pennsylvania law, is that an element of the offense or

22  is it an affirmative defense?

23      MR. ACKOUREY:  I would argue that really -- there's a

24  procedural element, in that one could raise the running of

25  the statute of limitations as a defense.  But I would argue,

1    Judge, that -- and I think Sylvester is going to address

2    this.  It's also a part and parcel of the government's burden

3    as an element of the offense that it has not run.  That the

4    statute has not run.

5         THE COURT:  Okay.  Let me just ask you one other

6    question on the statute.

7         MR. FISANICK:  Yes, your Honor.

8         THE COURT:  And that is with respect to the statute, is

9    everybody in agreement that although the alleged time of the

10   incident, which was in 2006, September 14.

11        MR. FISANICK:  14.

12        THE COURT:  2006, that within two years the Canadian

13   authorities received a warrant in Canada, but it wasn't

14   within two years that the United States received a warrant in

15   the United States.  On that issue, forgetting the

16   disagreement presently, are we in agreement that if the

17   statute was applicable, the time period is when it occurs in

18   the United States, not when the Canadian authorities have

19   done it, or are we not?

20        MR. FISANICK:  I don't know the answer to that question,

21   to be honest with you.  I concede that the U.S. proceeding is

22   outside the two years.  But the Canadian charge was filed

23   within two years of the actual incident.

24        THE COURT:  Okay.  So you're not conceding that the

25   United States execution, meaning the gathering of a warrant

```
 1      or the submission by the court, the filing of it, is what --

 2           MR. FISANICK:  Correct.

 3           THE COURT:  -- terminates the statute of limitations?

 4      And I assume your position is that it is?

 5           MR. ACKOUREY:  It is.  I can't cite any case law that

 6      would say that, but I would argue that the only court that

 7      had jurisdiction over my client at the time is the United

 8      States Court.  So the issuance of the summons here is what is

 9      the triggering event.  And clearly that was beyond the two

10      years.

11           THE COURT:  Okay.  Now you want to move on -- anything

12      else on those issues?  Are we going to move on to six, and

13      that is basically whether or not that there's competent

14      evidence to support a probable cause finding for which -- the

15      charges for which the extradition is sought.

16           MR. FISANICK:  Yes, your Honor.  If this were a normal

17      federal criminal proceeding the government in the United

18      States would be presenting an affidavit of probable cause to

19      support a criminal complaint on charges that the government

20      felt lay against a defendant.  The only difference we have

21      here is, we don't have an ex parte proceeding, we actually

22      have an adversarial proceeding looking at the paper that's

23      filed.  And your Honor --

24           THE COURT:  Well wait.  That's not exactly correct,

25      right?  If this was the United States proceeding under Rule
```

1   5.1 it would have been post complaint, which has already been

2   filed.

3        MR. FISANICK:  Correct.

4        THE COURT:  And that would have actually had an

5   adversarial proceeding at a preliminary hearing where live

6   witnesses would be called.  They could testify to hearsay but

7   there would probably be live witnesses.

8        MR. FISANICK:  Correct.  But if -- my argument, my

9   point, your Honor, is if the government presented this to

10  you, your determination of probable cause is based on the

11  affidavits.  And that's been the government's position since

12  the beginning of this proceeding, which is it a sui generis

13  proceeding where we go on the paperwork and the document and

14  the evidence that has been supplied.  The adversarial

15  proceeding comes down the way, so to speak.  What I'm asking

16  the court to do is, you're looking at this as an affidavit to

17  see if there's probable cause to support the charges.  And

18  that's what we have.

19       Defenses are not an issue.  Credibility is not an issue.

20  Weight of the evidence is not an issue.  Whether these

21  charges can ultimately be proven by Canada's burden of proof,

22  which I understand is also beyond a reasonable doubt, not an

23  issue.  The issue is probable cause for charges.  And we have

24  determined that these are in fact extraditable charges.  So

25  the question is, do they support what the Canadians have

asked us to do?  The facts to the light most favorable to the
Canadian government show this, and they are summarized in the
government's brief, that this defendant made statements to
the Royal Canadian Mounted Police that while she was hunting
in Canada she and her husband and a guide would walk in the
bush to hunt while she and the children waited for their
return.  So it is clear that the defendant knew that on the
night of the incident her husband and the guide had left the
truck while she remained with the children.  She knew that he
was in the woods.

     She admitted to the investigators that it was, quote,
probably too dark and that she should not have fired the
shot.  Now, obviously that statement and that finding really
is the linchpin here as to whether this conduct rises beyond
tortuous mere ordinary simple negligence to the level of
criminal negligence, reckless conduct or conduct evincing a
wanton disregard.

     Following the shooting the constables did I think a very
thorough investigation in the area of where the victim was
found.  And despite the defendant's story that she had
watched a black bear for a couple of minutes, they did not
see the footprints that resembled those of a black bear or
any other type of animal.  Now, this incident occurred at
approximately 7:55 p.m. on the date in question, sunset
having happened at 7:31 p.m.

1      And I know that counsel has made the argument that she

2  was within her rights to be hunting within a half an hour of

3  sunset.   That's correct.   The Canadians have not alleged that

4  she's in violation of the regulation for hunting after hours.

5  But I will submit to you in preparation for the argument

6  that's a strongman argument.   Just because she was legally

7  hunting within a half an hour of sunset doesn't mean that she

8  was entitled to fire a shot.   And I would say, your Honor,

9  for example, it's almost noon.   If the clouds would get

10  really dark because of a thunder storm or a solar eclipse and

11  hunting was in season, yes, you could be hunting at twelve

12  o'clock noon in downtown Wilkes-Barre today, Luzerne County,

13  but that doesn't answer the question as to whether you should

14  be taking a shot at that time based upon visibility

15  conditions.

16      THE COURT:   I think they banged a couple yesterday in

17  Wilkes-Barre, didn't they?

18      MR. FISANICK:   Did they really?   The Canadian Mounties

19  did two reenactments, and as the Court is well aware, and I

20  know the Court has read the documents in preparation for the

21  prior decision in this case and the hearing today, and the

22  constables were in agreement that both the lighting

23  conditions were too dark to have fired a shot.   So the Royal

24  Canadian Mounted Police have opined that she should not have

25  taken the shot, she admitted it was too dark and she

1    shouldn't have taken the shot.   Two reenactments showed

2    pretty much the same thing.   And the other thing we have to

3    keep in mind, your Honor, is we have to look at when the shot

4    was taken.   Was this a shot where it was a beautiful sunny

5    day, a bear was in view of the defendant and the bear was

6    close enough and the victim darted out in front between the

7    bear and the defendant with her 30-odd six rifle.   If that

8    were the situation the answer would be tortuous negligence,

9    if that, perhaps contributory negligence on behalf of the

10   victim.

11       Now, admittedly the victim wasn't wearing blaze orange

12   here and that contributed to his death, and I know the

13   Canadian authorities actually recognize that and I have some

14   uncertified documents from Canada saying, well, you know, you

15   should be wearing your blaze orange.   But the point of the

16   matter is we have to look at the circumstances of the

17   lighting.   This is the twilight time of day.   Hunting is

18   legal, but it's still pretty hard to see because it's within

19   a half an hour after sunset, so it's not a bright sunny day,

20   12 noon like my prior example.

21       No. 2, you know there are other human beings in the

22   woods.   The defendant is quite clearly aware that husband and

23   guide have gone out to hunt.

24       Third.   We have to look at the terrain.   We have a shot

25   taken by the defendant at an object obscured by grass that's

1   shoulder height, about four feet high, 200 feet away.  And

2   apparently from what the Mounties determined, the victim

3   would have been walking back across, for lack of a better

4   term, a logging trail or a truck trail or something like that

5   and there were ruts in the road and apparently water was in

6   the ruts and he would have, if I may, been standing and

7   looking at his boots to make sure he's not getting a boot

8   full of, you know, muddy water or falling down or tripping

9   because the visibility isn't that good, so he has his head

10   down and he's bobbing and moving kind of back and forth, so

11   he's not erect.  His face isn't apparently visible over the

12   four-foot high thicket, his head is down, he's not wearing

13   blaze orange.  He's just basically as the Mounties I think

14   described it as a black unidentifiable mass.

15       So that's what we have.  We have a shot fired from a

16   high-powered rifle at a distance of 206 feet into a four-foot

17   high thicket at some sort of moving mass.  No evidence that

18   there was a bear there.  And the other thing that strikes me

19   your Honor as very unusual here is, if this defendant's story

20   is to be believed, and that's something for a Canadian jury

21   or court to decide, and she claims she had seen the bear

22   walking around for a couple of minutes.  When you have a

23   clear shot at a bear shoot the bear.  Do you wait until the

24   bear goes behind the four-foot high thicket of grass so that

25   you have a bobbing mass to take a shot?

1        So from a common sense logistical standpoint, why is the

2    shot being taken at this particular time?  We have problems

3    of visibility, we have problems of terrain.  We have the fact

4    that she's standing on the bed of a pickup truck to make the

5    shot with her small children in the truck.  We have a

6    distance of 206 feet away, which admittedly for a 30 odd six

7    with a scope is not a particularly long shot, it's a

8    particularly close shot.  And you've seen a bear and you've

9    watched the bear and you've done nothing.

10        And then the bear disappears behind the thicket and you

11    shoot blindly into a thicket at an unidentified object that

12    as the constables put is really nothing more than a moving

13    mass.  Knowing full well you have living, breathing human

14    beings who are out hunting, and if we're following the

15    hunting laws of Newfoundland and Labrador you know would be

16    returning to the hunting camp in the truck very soon, because

17    hunting is about to end in a half an hour past sunset.

18    That's what we have.

19        I would submit to you, your Honor, that we're not here

20    to be armchair detectives and we're not here to decide guilt

21    or innocence, we're not here to interpret the facts as to

22    what exactly happened on that tragic day, and this is a

23    tragedy, don't get me wrong, this is terrible for everybody

24    who has looked at this case, been involved in this case or

25    touched this case.

1        What we have to determine is does this support probable

2   cause to expedite this defendant to Canada?  And I submit

3   that it clearly does.  We don't have a case where the victim

4   darted in front of the gun, we don't have a case where a gun

5   went off by accident because it was dropped or somebody

6   tripped.  We don't have a case of a small child, God forbid,

7   picking up the gun and the gun is being discharged.  No.  We

8   actually have an intentional, deliberate shot, a tragic shot,

9   that took the life of Mr. Harshbarger because this woman

10  sitting here in court did something that every small child

11  who's taken a hunter/trapper safety course in Pennsylvania

12  knows, you don't shoot at an unidentifiable target.

13       So I would submit to you that despite sympathetic

14  evidence that might show a defense, sympathetic evidence that

15  might show contributory negligence, whether that's a defense

16  or not in Canada, I don't know, but that's not for us to

17  determine, there's enough evidence to comply with the treaty

18  and comply with Canadian Government requests and have Mary

19  Beth Harshbarger extradited for the two charges.  Thank you.

20       THE COURT:  Okay.  Mr. Ackourey.

21       MR. ACKOUREY:  Judge, applying the law to the facts as

22  we know them, and again, looking at the facts and observing

23  the facts in a light most favorable to Canada, the Court must

24  nonetheless determine whether or not there is probable cause.

25  And we start with the wanton and reckless disregard for life

1   standard.   Section 1112 of Title 18 of the United States Code

2   requires a showing that either the actor acknowledged that

3   the conduct was a threat to the life of another, or

4   acknowledge such circumstances as could reasonably have

5   enabled the defendant to foresee the peril to which her act

6   might subject another.

7          In this case we have a family, husband, wife and

8   children.   They've hired a guide, Lambert Greene, his

9   affidavit is part of the record.   They're not out there

10  willy-nilly, they've hired a guide who supposedly knows the

11  topography, knows the terrain and knows the hunting rules and

12  regulations.   He takes them to a location that's very remote.

13  They've done this before, where Greene and the decedent exit

14  the vehicle, go out into the woods while my client is to

15  remain with the children, with a gun, and the understanding

16  is Mr. Greene's affidavit indicates what -- that she was to

17  shoot if she saw a moose or a bear.   That's what she's

18  operating under.   On this particular day the hunting day

19  would have ended at 8:01.   Sunset would have been at 7:31.

20  And the fired shot in the Canadian investigation was at 7:55,

21  within that timeframe.

22         THE COURT:   That's their estimate.

23         MR. ACKOUREY:   Pardon?

24         THE COURT:   That's their estimate.   Obviously they --

25         MR. ACKOUREY:   That's correct.

1       THE COURT:  -- but they estimate 7:55.

2       MR. ACKOUREY:  That's correct.  But that is the

3   uncontradicted evidence in the filed report.

4       THE COURT:  No doubt.

5       MR. ACKOUREY:  The government of Canada or the

6   governments in Newfoundland and Labrador have determined that

7   firing this shot a half hour after sunset is permissible.

8   They have determined that there is sufficient light on a

9   typical day to allow hunting.  There's nothing in the

10  affidavits that I'm aware of that would say that there were

11  any particularly significant weather patterns or conditions

12  that would have altered or affected that.

13      The decedent and the guide go into the woods.  My client

14  remains at the truck.  She sees what she believes to be a

15  bear.  Two reenactments confirm that based upon the time of

16  day or location, the location of the decedent and the

17  conditions as they existed at the time, that it was possible

18  that she could have believed that was a bear.  Twice they did

19  it.  Twice they came up with the same conclusion.

20      As already testi- -- or already discussed, the ground

21  condition is such that the decedent would have been walking

22  like a bear; bobbing up and down; going from track to track;

23  moving sideways.  The grass, and it's interesting because

24  this was noted by counsel, through his affidavit, indicates

25  that it's deceiving when you look at the -- where the

1    decedent was found, because while the grass appeared to be

2    knee high from the truck, in fact it was shoulder high, which

3    means that the object that Mary Beth was looking at, the

4    person she was looking at, would not have looked like a six

5    foot man, it would look like a much smaller being, consistent

6    with, as she said, she thought she was shooting at a bear.

7          THE COURT:   If counsel indicated that it was four foot

8    high, I have a recollection that the affidavit was five foot

9    high.

10         MR. FISANICK:   Between --

11         MR. ACKOUREY:   It's between four and five.  I believe

12   they said shoulder high I thought is what his affidavit said.

13         THE COURT:   All right.

14         MR. ACKOUREY:   So, there's an allusion there of a

15   smaller being that she's firing at.  She fires the shot.  And

16   obviously, unfortunately, she killed her husband.  When we

17   look at the facts in the case, knowing that her act was a

18   legal act in that she was firing legal within the

19   regulations, hunting regulations of the province, the

20   question is let's look at the other circumstances surrounding

21   it and ask, Is there recklessness?  Is there wanton reckless

22   disregard for life?

23         Well, the other factors seem to support a conclusion of

24   no.  The topography; the way he was dressed; the way he moved

25   all seemed to suggest no.  The linchpin of the government's

1    case, your Honor, the prima facie basis or the probable cause

2    basis is it was too dark to shoot.  But it was a legal act at

3    the time, at least within the hunting regulations.  The one

4    investigator said that coming out of the --

5         THE COURT:  Let me just ask you, you keep saying it's a

6    legal act.  If it was 12 noon and bright sunshine --

7         MR. ACKOUREY:  Sure.

8         THE COURT:  -- and there was something moving that you

9    couldn't identify and you shot at it, is that okay?  I mean,

10   or is it just a question of --

11        MR. ACKOUREY:  Oh, no, I'm not saying that it's okay.

12   It is raised to the level of gross negligence or

13   recklessness.

14        THE COURT:  Right.  But for example, if I go on 81 today

15   and the speed limit says 55 and there's an ice storm and I

16   travel 45 or 40, and I end up killing somebody, I could have

17   traveled 55 according to the speed limit, but the conditions,

18   even though the speed limit says that, may not have been

19   appropriate to do that at the time.  So I guess at 8:01 she

20   has to stop shooting, but at eight o'clock, even though I

21   would think to most of us there would be no discernible

22   difference in the light of the day in that one minute, is

23   that of any other significance?  I get what you're saying to

24   the extent that it was not per se a violation of the hunting

25   law to hunt at 7:55, but is that something that is really

1   offering me anything I guess?   Isn't it really what were the

2   conditions at the time?

3       MR. ACKOUREY:   Well, no.   I would disagree to the extent

4   that using your analogy, if the roadside said 55 miles per

5   hour, and traveling 55 miles per hour in an ice storm, okay,

6   maybe the fact that it says 55 miles an hour doesn't excuse

7   your negligent or grossly negligent behavior.   But that's not

8   what we have here.   We have nothing to indicate that there

9   were any environmental conditions or other conditions which

10  would make firing a shot up to 8:01 somehow grossly

11  negligent.

12      THE COURT:   Except that we know that we're 24 minutes

13  after sunset.   I mean, I understand that you're saying that

14  under law they say you can be out a half an hour after

15  sunset, but you're 24 minutes after sunset.   Is that

16  different than being when the sun is up?

17      MR. ACKOUREY:   Well, I guess.   I guess somewhere in

18  Canada someone decided that there's sufficient light to fire

19  a shot in normal weather conditions up to 8:01.   I mean,

20  that's the only reasonable basis for the regulation, at some

21  point someone must have said there's enough light to fire a

22  shot up to 8:01, and beyond that we're not going to permit

23  it.   And there's no evidence that there's any adverse

24  conditions that would in any way affect that determination.

25      I think -- I mean, if you were looking at factors

1   leading to this unfortunate series of events, you would have

2   to say that the failure to wear orange, and I don't mean to

3   speak ill of the dead, but the failure to wear orange is

4   probably the greatest factor leading to this tragic event.

5   No orange hat, no orange vest, no orange pants in conditions

6   that presented themselves on that day made him look like a

7   bear.

8        THE COURT:  Assuming all that is true, and it clearly is

9   true by the affidavit and I agree with you that I don't

10  understand why somebody wouldn't do that, but would it be

11  reasonable to assume that on the facts we have here that Mrs.

12  Harshbarger was aware of the fact that he wasn't wearing

13  orange?

14       MR. ACKOUREY:  I would assume -- based upon the facts we

15  have, I would assume that she would have known that he had no

16  orange on, that's correct.  But it's complicated by the fact

17  that he has dark clothes on.  So it's a double whammy if you

18  will, not only did he not have orange, he had dark clothes.

19       I guess -- I'm looking at U.S. v.  Pardee, the Fourth

20  Circuit case, and they're paraphrasing Maryland v. Chapman.

21  If the resulting deaths were merely accidental or due to an

22  honest error in judgment in performing a lawful act the

23  existence of gross negligence should not be found.  And I

24  think that's exactly what we have here.  In other words, was

25  it an error of judgment for my client to fire a gun?  Perhaps

1    it was.  Obviously it was.

2         THE COURT:  Is that part of the extradition proceeding?

3         MR. ACKOUREY:  No, it is not.

4         THE COURT:  Is there a probable cause hearing or is it a

5    determination after trial beyond a reasonable doubt?

6         MR. ACKOUREY:  Excuse me.  Pardee was discussing

7    extradition.  Maryland v. Chapman which it cites was not an

8    extradition hearing.  I guess the point is, Judge, that there

9    was clearly an error in judgment for firing, but that's not

10   enough to get to a wanton reckless disregard for life

11   standard, and that's our position.  Is that while there may

12   have been an error in judgment, while there may have been

13   negligence here, it wasn't gross negligence or certainly not

14   recklessness warranting extradition, and that's the

15   government's proof here on a prima facie level.

16        THE COURT:  Let me ask both of you this.  I mean the

17   problem of course always with mens rea is that, you know,

18   we're unable to scientifically prove mens rea.  I mean, we

19   can't -- and I'm sure as a defense counsel at trial you're

20   often up there, you know, saying -- as the prosecutor

21   probably is saying to the jury that, you know, during the

22   entire trial I'm not going to be able to by some surgical

23   method extract that area of the person's brain that says they

24   knew or didn't know.

25        It normally does depend upon circumstances.  It depends

 1   on credibility, things that I am not entitled to weigh here.

 2   How believable the witnesses are or aren't when they actually

 3   tell their story in front of people who can understand that.

 4   My decision is to decide whether or not based upon the

 5   evidence that's here there's probable cause to believe that

 6   that standard has been reached, not whether it in fact has

 7   been reached.

 8        And so I guess my question to you in that respect is

 9   that everyone agrees that all I can depend upon here is what

10   the affidavits have.  I understand that your position is that

11   we should be required to depend upon more.  The government

12   should be required to call live witnesses, and ultimately

13   we'll address that issue in our decision in the case.

14        But assuming I don't agree with that, or I think that

15   the law is different than that, that the law does in fact --

16   it's really the kind of the totality of all of the

17   affidavits.  I've looked at them thoroughly.  I've looked at

18   them when I was making a different decision.  And that was

19   the decision as to whether bail would be appropriate.  And

20   that to me was a different standard than presently when I

21   look at it, and I'll look at them again before I make my

22   decision in this case.

23        But it really comes down to -- it sounds to me you're

24   both in agreement -- this issue of whether or not there is

25   probable cause in your case based upon the submitted

1   affidavits and in your case, since there is no other evidence

2   that's been presented, unless you're legally correct and

3   they're wrong, and I make that decision in what they can't

4   submit, then it's based upon what's in those affidavits.

5        And my decision, as I said, is not to decide whether

6   there is or is not recklessness, but whether there is or is

7   not probable cause to believe that there's recklessness that

8   a jury should decide later on.  Is that your understanding

9   then of what it is that I need to do?

10       MR. ACKOUREY:  I would agree with that assessment.

11       MR. FISANICK:  Absolutely correct, your Honor.

12       THE COURT:  All right.  Okay.  I don't know that I have

13  any other questions.  I apologize for interrupting both of

14  you during the course of your presentations to ask questions,

15  but I wanted to just flush out a bit.  But is there anything

16  else that the government -- it's your burden -- that you want

17  to mention now that we're -- or Mr. Ackourey, I assume that

18  you are done with your presentation?

19       MR. FISANICK:  I am.

20       THE COURT:  Is there anything else, Mr. Fisanick, you

21  want to mention?

22       MR. FISANICK:  Yes.  There's one other matter, which is

23  your Honor, if this Court feels that it's not going to be

24  able to find extraditability on this offense the case law

25  permits the filing of supplemental briefing documents and

```
 1    other evidence from a foreign government.  So the Government,

 2    on behalf of the Government of Canada, I would request the

 3    right, if this Court issues an order not extraditing to allow

 4    proceedings to be re-opened so the foreign government could

 5    submit supplemental information.

 6         THE COURT:  Mr. Ackourey.

 7         MR. ACKOUREY:  Judge, I just think it's premature at

 8    this stage.

 9         THE COURT:  Well, I think it's almost more than

10    premature, and here's my concern, is that the government can

11    submit whatever it is that you wish to submit.  No one has

12    stopped the government, for example, in the time between your

13    original submissions to us and now from submitting under the

14    appropriate standards whatever additional matter you thought

15    needed to be submitted to Canada.

16         MR. FISANICK:  But I guess, Your Honor, if I may

17    interject --

18         THE COURT:  Not yet --

19         MR. FISANICK:  I'm sorry.

20         THE COURT:  -- but then you can.  Let me finish what I

21    have to say and then you can.  You know, the government --

22    the burden is on you.  You need to submit your documentation,

23    and you did submit documentation.  The documentation of

24    course has a number of hoops that it needs to go through.  It

25    isn't a question merely of kind of gathering documentation.
```

1    It needs to be submitted through two state departments and

2    then ultimately get certified and then come here.  You

3    certainly had that opportunity.  And even from when the

4    government first received this case, which my guess would be

5    it's probably a year ago.  How long ago was it that the State

6    Department received the request from Canada?

7        MR. FISANICK:  That I don't know.  I know my office has

8    received it less than six months ago.

9        THE COURT:  Okay.  But I would assume that the State

10   Department had it a good bit of the time before you.  My

11   recollection of dealing with the Office of International

12   Affairs in the State Department was that -- I could be wrong

13   -- but my guess is it's been a good year that they had the

14   case.  I only say that in that you have an opportunity to

15   submit whatever you want, and I agree that you're entitled to

16   submit whatever you want, but the Court -- it would be

17   foolish to expect that the Court should now be making a

18   decision of oh, well, if we agree with the defendant's

19   position we can't do that, we have to give the government

20   more time to argue something else when they had time to argue

21   that in the first place.  So I don't think that I see that as

22   being an appropriate option.

23       MR. FISANICK:  Now may I speak, your Honor?

24       THE COURT:  Yeah.

25       MR. FISANICK:  No.  I direct that option to this:  If

1   you agree with the defense's position that hearsay by itself

2   cannot support an extradition, we want to reserve the right

3   if the Canadian Government so chooses to send the detectives

4   down here.  And that issue would not have arisen but for your

5   ruling.

6        THE COURT:  Okay.  And then that -- that's a different

7   issue.  And on that issue I would consider that, since if I

8   did decide in that way, it strikes me that that would be an

9   issue of first impression, since I haven't been able to find

10   any cases that have ruled in that regard.  And so in that

11   circumstance it would seem to make sense to allow counsel,

12   since they couldn't reasonably have been aware that that

13   would be a ruling in a case, since I haven't found any case

14   law that has done that.  So if that were to happen I would

15   consider whether or not it would be appropriate to reopen the

16   hearing or allow further submission.  Anything else?

17        MR. FISANICK:  Nothing else, your Honor.

18        THE COURT:  Mr. Ackourey?

19        MR. ACKOUREY:  Nothing further, Judge.

20        THE COURT:  Okay.  I'm going to take the matter under

21   advisement.  I'm going to continue Ms. Harshbarger in the

22   same conditions as was previously set.  I always hate to set

23   very specific limits, but it is my intention to come to a

24   conclusion on this case relatively expeditiously.  And so I'm

25   hoping that you will hear from me in the reasonable future.

1    That doesn't mean it's going to be Monday, it's not.  But

2    I'll need some time to go through what's been said today,

3    review some of the case law and probably take a look at the

4    transcript of the proceeding.  And I'm just indicating that I

5    do want a copy of the transcript of the proceeding as soon as

6    reasonably possible.  And then shortly after that we'll come

7    to a conclusion.  Thank you very much.

8                       (BRIEF RECESS TAKEN.)

9         THE COURT:  One last thing before counsel goes.

10        MR. FISANICK:  Yes, your Honor.

11        THE COURT:  And that is in the event that we do decide

12   on extradition, and I'm not saying that we will, but if I

13   make that decision I noticed that in the forms that I have

14   there are multiple different types of forms that are

15   submitted by the government.  So I would ask that the

16   government and the defense counsel get together and agree on

17   what would be -- or submit proposed forms that order the

18   extradition if that circumstance occurs.  All right.

19        MR. FISANICK:  Can we wait until if you order

20   extradition?

21        THE COURT:  I assume that it's a form order that you've

22   got, that it's a most recent one?

23        MR. FISANICK:  I think I submitted that.  I may not

24   have, but we will when we get the order, assuming you order

25   extradition.

1        THE COURT:  We can do that.  What we'll do then, we'll

2    make a decision on the case and if we make that order we'll

3    give the parties time to submit to us an appropriate order

4    that would accommodate that.

5        MR. FISANICK:  Very well, your Honor.

6        THE COURT:  I don't want to make any misunderstanding,

7    by the way.  I have not decided this case.

8                    (12:17 p.m., court adjourned.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

     I, DIANA L. GILBRIDE, Official Court Reporter for the

United States District Court for the Middle District of

Pennsylvania, appointed pursuant to the provisions of Title

28, United States Code, Section 753, do hereby certify that

the foregoing is a true and correct transcript of the

within-mentioned proceedings had in the above-mentioned and

numbered cause on the date or dates hereinbefore set forth;

and I do further certify that the foregoing transcript has

been prepared by me or under my supervision.

                                    _____
                                    Diana L. Gilbride, RMR, FCRR
                                    Official Court Reporter

REPORTED BY:

          DIANA L. GILBRIDE, RMR, FCRR
          Official Court Reporter
          United States District Court
          Middle District of Pennsylvania
          P.O. Box G
          Scranton, PA  18501-0090

          (The foregoing certificate of this transcript
does not apply to any reproduction of the same by any means
unless under the direct control and/or supervision of the
certifying reporter.)